99 A.3d 381

**In re Nomination Petition of Robert GUZZARDI for the Republican Nomination for Governor of Pennsylvania in the Republican Primary of May 20, 2014.**

**Appeal of Richard W. Stewart, Robert K. Robinson, Richard Tems and Donna M. Cosmello.**

Supreme Court of Pennsylvania.

Submitted April 21, 2014.

Decided May 1, 2014.

Kathleen Marie Kotula, Esq., PA Department of State, for Bureau of Elections.

William J. Leonard, Esq., Richard P. Limburg, Esq., Lawrence J. Tabas, Esq., Obermayer Rebmann Maxwell & Hippel, L.L.P., Philadelphia, for Richard W. Stewart, Robert K. Robinson, Richard Tems and Donna M. Cosmello.

Gretchen Deborah Sterns, Esq., Law Office of Gretchen Coles Sterns, L.L.C., Pottsville, for Robert Guzzardi.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice SAYLOR.

Given time constraints associated with an impending primary election contest, the present election appeal was previously resolved via *per curiam* Order. *See In re Nomination Petition of Guzzardi,* 625 Pa. 336, 91 A.3d 701 (2014) (directing that Appellee Robert Guzzardi's name be stricken from the primary ballot for the Republican Party nomination for the Office of Governor of Pennsylvania). With the exigency abated, we are now able to supplement the brief explanation provided in our Order with the discussion that follows. Primarily, we have determined that Pennsylvania courts are not empowered to employ principles of equity to override the express statutory command that the failure of a candidate for statewide public office to file a timely statement of financial interests with the Pennsylvania State Ethics Commission "shall ... be a fatal defect to a petition to appear on the ballot." 65 Pa.C.S. § 1104(b)(3).

Per the Public Official and Employee Ethics Act,[1] candidates for state-level public office must file a statement of financial interests with the Ethics Commission on or before the last day for filing a petition to appear on the ballot for the election. *See* 65 Pa.C.S. § 1104(b)(1). The General Assembly has provided for strict enforcement of this requirement, on pain of disqualification from ballot access. Specifically, the Legislature has prescribed:

> Failure to file the statement [of financial interests] in accordance with the provisions of this chapter shall, in addition to any other penalties provided, be a fatal defect to a petition to appear on the ballot.

*Id.* § 1104(b)(3).

1. Act of October 15, 1998, P.L. 729, No. 93 (as amended 65 Pa.C.S. §§ 1101–1113) (the "Ethics Act").

On March 10, 2014, in conformity with the Election Code,[2] Robert Guzzardi filed a timely nomination petition with the Department of State, seeking placement of his name on the ballot for the Republican nomination for the Office of Governor. *See* 25 P.S. § 2867. Although an original statement of financial interests was appended to this petition, Mr. Guzzardi failed to make the mandatory tender to the Ethics Commission prior to the statutory deadline.

Appellants, qualified electors and registered voters, filed a petition to set the nomination petition aside in the Commonwealth Court. *See* 25 P.S. § 2937; 42 Pa.C.S. § 764. Among other challenges, they invoked the statutory fatal-defect rule which, by its plain terms, required Mr. Guzzardi's name to be removed from the primary election ballot, in light of his undisputed failure to file a timely statement of financial interests with the Ethics Commission. The Commonwealth Court, however, refused to enforce the governing legislative directive.

Rather, the single judge administering the matter conducted a hearing and issued an order denying Appellants' objections. In an unpublished opinion, she relied on a line of Commonwealth Court decisions which have found the judiciary to be possessed with the power to permit a fatal defect to be "cured" through the application of equitable principles. *See, e.g., In re Nomination Petitions of Howells*, 20 A.3d 617, 621–22 (Pa.Cmwlth.), *aff'd per curiam*, 611 Pa. 559, 28 A.3d 915 (2011). In this regard, it was the court's position that Mr. Guzzardi had offered sufficient, non-negligent explanations to justify treating his late-filed statement *nunc pro tunc*, or as if it had been submitted to the Ethics Commission on time.[3]

---

**2.** Act of June 3, 1937, P.L. 1333, No. 320 (as amended 25 P.S. §§ 2600–3591).

**3.** The nature of these accepted explanations is not germane to our resolution of this appeal. Nevertheless, by way of background, the Commonwealth Court found that an aide to Mr. Guzzardi was misled by an unidentified "young woman with dark brown hair" in the offices of the Department of State into believing that filing a statement of financial interests with the Ethics Commission was unnecessary. *In re Nomination Petition of Guzzardi*, 158 M.D.2014, *slip op.* at 26 (Pa. Cmwlth. Apr. 15, 2014). The court also faulted the Department of State for accepting an original of the statement of financial interests with the

Upon Appellants' direct appeal to this Court, they cited *In re Petition of Cioppa,* 533 Pa. 564, 626 A.2d 146 (1993) (plurality), where, twenty years ago, the lead opinion characterized the fatal-defect provision as being clear, unambiguous, mandatory, and unyielding. *See id.* at 571, 626 A.2d at 149 ("[H]ereafter failure to file the requisite financial interests statement within the prescribed time shall be fatal to a candidacy."). In this regard, Appellants emphasized the *Cioppa* plurality's admonitions that, through the fatal-defect rule, the General Assembly had "foreclosed the possibility for curing" and "foreclosed our inquiry into the individual circumstances which may have contributed to the untimely filings." *Id.* at 569, 626 A.2d at 149. According to Appellants, such understanding was recently solidified by a majority opinion in *In re Nomination of Paulmier,* 594 Pa. 433, 444–45, 937 A.2d 364, 370–71 (2007) (referencing *Cioppa* in holding that "the fatality rule announced in Section 1104 of the Ethics Act was intended by the Legislature to bar . . . those candidates from the ballot who fail to file statements of financial interests or who file them in an untimely manner."). Appellants also explained that the requirement to file timely financial statements with the Ethics Commission furthers an important legislative objective, namely, protecting the integrity of the election through the Commission's substantive evaluation of the contents of such statements. *See* 65 Pa.C.S. § 1107(5) (requiring the Commission to "[i]nspect statements of financial interests which have been filed in order to ascertain whether any reporting person has failed to file such a statement or has filed a deficient statement").

In response, Mr. Guzzardi posited that the strict requirements of the Ethics Act must be balanced with the liberal construction required, in election cases, in favor of ballot access. *See Paulmier,* 594 Pa. at 445, 937 A.2d at 371. Mr. Guzzardi believed that the Commonwealth Court's invocation of equitable principles opening the possibility for the "cure" of

nomination petition, positing that the agency bore responsibility to return the original to Mr. Guzzardi and request a copy in its place. *See id.* at 33.

6

fatal defects is consistent with the "spirit of the Ethics Act." Brief for Appellee at 12. He suggested that his filing with the Department of State represented substantial compliance with the Ethics Act's requirement for filing with the Commission, and he asserted that neither Appellants nor the general public suffered any prejudice.

On an expedited basis, we undertook plenary review of the legal issue of whether equity lies to override disqualification from ballot access as dictated by statute. In further development of our holding that recourse to equity is not available toward such end, we begin with the derivation of the statutory fatal defect rule.

In *State Ethics Commission v. Baldwin,* 66 Pa.Cmwlth. 40, 444 A.2d 767, *rev'd,* 498 Pa. 255, 445 A.2d 1208 (1982), *superseded by statute as recognized* in *Cioppa,* 533 Pa. at 569, 626 A.2d at 148–49, the Commonwealth Court determined that the failure to file a timely statement of financial interests with the Ethics Commission was, as this Court put it, a "fatal defect." *Baldwin,* 498 Pa. at 259, 445 A.2d at 1210 (characterizing the Commonwealth Court's reasoning in the underlying case). On appeal, this Court found such approach to be "stilted and harsh" and rejected it in favor of a more liberal treatment allowing for amendments to remedy deficiencies, at least in the absence of intent on the part of a candidate to defraud. *Id.*

The Court's disapproval of the fatal-defect rule, however, represented only an exercise in statutory construction. *See id.* ("We are satisfied that a correct analysis [of Section 1104(b)'s predecessor] *does not reflect a legislative intent* requiring the stilted and harsh ruling reached by the Commonwealth Court in this case." (emphasis added)). It is material, then, that in 1989, the Legislature specifically overrode the Court's construction by amending the Ethics Act to make explicit that it did, in fact, envision a strict filing requirement on pain of disqualification. *See* Act of June 26, 1989, P.L. 26, No. 9, § 4(b)(3) ("Failure to file the statement in accordance with the provisions of this act shall ... be a fatal

defect to a petition to appear on the ballot.") (recodified, as amended, at 65 Pa.C.S. § 1104(b)(3)).

Difficulties ensued in implementing this amendment, which obviously called for results with which the Court had expressed strong discomfort. On the one hand, this Court interpreted the statutory fatal-defect rule to require filing of statements of financial interests "in accordance with the provisions of this chapter," 65 Pa.C.S. § 1104(b)(3), that is, *all* the provisions of Chapter 11 of the Ethics Act. Since Chapter 11 sets forth the required content for statements of financial interests, deficiencies in substantive disclosures on timely filed statements were deemed disqualifying. *See, e.g., In re Nomination Petition of Littlepage,* 589 Pa. 455, 464, 909 A.2d 1235, 1240–41 (2006) (holding that the statutory fatal-defect provision barred a candidate from ballot access, in light of his failure to disclose income derived from rental properties in his statement of financial interests); *In re Braxton,* 583 Pa. 35, 874 A.2d 1143 (2005) (*per curiam* ) (holding that a candidate's failure to disclose sources of rental income and the names and addresses of creditors on a statement of financial interests required removal from the ballot, per Section 1104(b)(3)); *In re Nomination Petition of Anastasio,* 820 A.2d 880, 881 (Pa.Cmwlth.) (holding that the fatal-defect rule was disqualifying relative to a candidate who failed to disclose sources of income on a statement of financial interests), *aff'd per curiam,* 573 Pa. 512, 827 A.2d 373 (2003). On the other hand, the Court acted to temper the fatal-defect provision by permitting amendments for technical defects appearing on the face of financial statements, where, otherwise, substantial compliance with the requirements of the Ethics Act could be found. *See, e.g., In re Nomination Petition of Benninghoff,* 578 Pa. 402, 414, 852 A.2d 1182, 1189 (2004) (rejecting the position that a candidate's failure to list the Commonwealth as a direct source of income on a statement of financial interests was a fatal defect, where the candidate had otherwise disclosed his status as a state representative). Ultimately, in light of continuing tension between these lines of cases, the Court disavowed the decisions applying Section 1104(b)(3)'s fatal-defect rule to content-based deficiencies, limiting the rule's application to in-

stances in which candidates fail to file statements of financial interests or do not meet the statutory filing deadline. *Paulmier*, 594 Pa. at 445–46, 937 A.2d at 370–71.

As such, application of the fatal-defect command is now sharply limited. Within the narrow ambit of the rule's remaining purview, however, the courts are not free to disregard the explicit legislative direction based on equitable considerations. *Baldwin* manifested this Court's belief that the General Assembly would have intended for such considerations to be taken into account, *see Baldwin*, 498 Pa. at 259, 445 A.2d at 1210, but the Legislature's response was to dictate precisely the opposite, *see* Act of June 26, 1989, P.L. 26, No. 9, § 4(b)(3) (recodified, as amended, at 65 Pa.C.S. § 1104(b)(3)). Even if the words chosen by the Legislature, *i.e.*, "fatal defect," did not make it plain enough, this history confirms that the application of equitable principles is manifestly contrary to legislative intent.

Elections are appropriately regulated by the political branch precisely because they are inherently political. This essential legislative governance fosters orderly, efficient, and fair proceedings. In this regard, statutory filing requirements and attendant deadlines "ensure the orderly functioning of the primary-election timetable so that those responsible will have sufficient time to prepare the ballot properly." *Gomes v. Rhode Island State Bd. of Elections*, 120 R.I. 951, 393 A.2d 1088, 1090 (1978).

Out of respect for the political branch and for the sake of regularity and orderliness in the election process, the Supreme Court of Connecticut recently held that courts cannot exercise equitable powers to mitigate harsh results in derogation of legislative requirements for strict compliance with election-related deadlines. *See Butts v. Bysiewicz*, 298 Conn. 665, 5 A.3d 932, 947 (2010). Initially, the court explained:

> We note that it long has been settled in other jurisdictions that statutes employing [mandatory] language in filing deadlines for ballot access are deemed mandatory, and that, with limited exceptions not implicated in the present case, strict compliance is required such that neither the election

official nor the court can excuse a candidate's inadvertent noncompliance.

*Id.* at 940 (citing 26 AM. JUR. 2D ELECTIONS § 216 (2004), *Andrews v. Secretary of State,* 235 Md. 106, 200 A.2d 650, 651 (1964), and *Smith v. Kiffmeyer,* 721 N.W.2d 912, 914–15 (Minn.2006)) (footnote omitted); *accord Foster v. Evert,* 751 S.W.2d 42, 44 (Mo.1988) ("[E]lection contest statutes are a code unto themselves. The procedures there established are 'exclusive and must be strictly followed as substantive law.'") (quoting *Hockemeier v. Berra,* 641 S.W.2d 67, 69 (Mo.1982)). Addressing the role of the judiciary's equitable powers, the Connecticut court quoted as follows from a responsive opinion in a decision of a Michigan appeals court, later adopted by the Supreme Court of Michigan:

> Equity only applies in the absence of a specific statutory mandate.... [I]t is not [a court's] place to create an equitable remedy for a hardship created by an unambiguous, validly enacted, legislative decree.... This should be particularly true of election law. If this [c]ourt were to erode the statutory requirements of election law through the use of equity, we would create ambiguity and inconsistency in what needs to be a uniform and stable area of law.

*Butts,* 5 A.3d at 943 n. 16 (quoting *Martin v. Secretary of State,* 280 Mich.App. 417, 760 N.W.2d 726 (2008) (O'Connell, J., dissenting)); *see Martin v. Secretary of State,* 482 Mich. 956, 755 N.W.2d 153, 154 (2008) (adopting the salient reasoning of Judge O'Connell's dissent on appeal); *accord Repsold v. Indep. Sch. Dist. No. 8,* 205 Minn. 316, 285 N.W. 827, 829 (1939) ("[C]ourts should be reluctant to interfere with political matters by granting equitable relief [outside the scope of election contest statutes].").

We agree with the Supreme Courts of Connecticut and Michigan that the judiciary should act with restraint, in the election arena, subordinate to express statutory directives. Subject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania. At least where the

Legislature has attached specific consequences to particular actions or omissions, Pennsylvania courts may not mitigate the legislatively prescribed outcome through recourse to equity. The Commonwealth Court's contrary approach, as manifested in the *Howells* line of decisions is therefore disapproved.[4]

With regard to Section 1104(b)(3), quite obviously, the Legislature could have provided that the filing of a statement of financial interests with the Ethics Commission may be deemed timely where candidates are able to demonstrate ostensible non-negligent reasons for failing to meet the statutory deadline. Nevertheless, it did not do so—instead, the Assembly pronounced a bright-line rule couched in strong admonitory terms. Respectfully, contrary to the dissents' claims to a reasonable counter-interpretation, "fatal" and "curable" are simply antonyms.[5]

Although our enforcement of the governing statutory fatal-defect rule was dispositive of this appeal, we take this opportu-

---

4. Although this Court affirmed the Commonwealth Court's order in *Howells* via *per curiam* order, unexplained orders of this variety do not necessarily reflect this Court's approval of the reasoning applied. In any event, *per curiam* orders do not serve as binding precedent, *see, e.g., Heim v. MCARE Fund*, 611 Pa. 1, 9, 23 A.3d 506, 510 (2011), which should be grounded on developed reasoning.

   The dissent references a case arising under the Unemployment Compensation Law, 43 P.S. §§ 751–914, in support of its proposition that *nunc pro tunc* principles should apply, despite the occurrence of a "fatal defect" under governing statutory law. *See* Dissenting Opinion, at 17–24, 99 A.3d at 393–95 (Baer, J.). Of course, there is no fatal-defect provision in the Unemployment Compensation Law.

5. Since the present situation is vastly different from the "natural disaster, fire, or bomb threat" scenarios envisioned by the dissent, *see* Dissenting Opinion, at 25, 99 A.3d at 395 (Baer, J.), we do not address those here. We reiterate, however, that judicial enforcement of the fatal-defect rule extends only to the limits of the federal and state Constitutions and recognize that such enforcement in impossibility scenarios may test such boundaries.

   In response to Madame Justice Todd's remarks, we have no intention of distinguishing among real and/or hypothetical events in terms of the unavailability of equitable relief. We have only taken the opportunity to reply to the dissents' suggestion that courts should undertake equitable review, circumventing a clear and express statutory command, merely because it is possible to conceive of exceptional circumstances in which enforcement of the disability might be viewed as extreme. Notably, Justice Todd offers no authority supporting her position that

nity to respond to the dissents' assertion that this case presents "non-negligent" and "extraordinary" circumstances and a "breakdown in the administrative process." Dissenting Opinion, at 24–25, 99 A.3d at 391, 393 (Baer, J.). In our view, the attachment of such labels in the scenario reflected in the present record is problematic, particularly since it sets a very low threshold for what is to be considered non-negligent and exceptional.

In this regard, at the hearing before the Commonwealth Court, Mr. Guzzardi straightforwardly acknowledged that he had not read the statutory requirement relative to the filing of a statement of financial interests, *see* N.T., April 3, 2014, at 199, and either did not read or did not apprehended explicit directions contained on the prescribed form which he had completed, *see* N.T., April 2, 2014, at 183–84, 198–200; N.T., April 3, 2014, at 199–200 ("I think I said that I read it but did not understand or comprehend."). Thus, according to his own testimony, from the beginning Mr. Guzzardi had no intention to file an original statement of financial interests with the Ethics Commission:

> Q. [W]as it your intent to file the statement of financial interests with the Ethics Commission on Monday, March 10th?

conjectural constitutional impingements arising from a statute's application in unrealized and unusual circumstances should curtail its enforcement across the wide array of the more ordinary (yet substantially exigent and disruptive), real election controversies which the statute was obviously designed to redress. In our view, such manner of analysis demonstrates an insensitivity to the plain meaning of legislative enactments, their underlying purposes, and the strong presumption of constitutionality which they enjoy.

Indeed, this Court has long maintained that, "[w]hile we strive to interpret statutes in a manner which avoids constitutional questions, we will not ignore the plain meaning of the statute to do so." *Housing Auth. of Chester Cnty. v. CSC*, 556 Pa. 621, 644, 730 A.2d 935, 948 (1999). One obvious purport of this settled, restrained, deferential approach centered upon the will of the Legislature is that, to the degree individual rights might be impinged by a clearly-written statute in imagined and extraordinary cases, vindication of those rights is left to future as-applied challenges to the enactment as these may arise. The alternative approach of undercutting a straightforward legislative directive and its purposes throughout the statute's broad-scale application has long been rejected by the courts.

A. No.

Q. Why wasn't it your intent to do that?

A. I didn't know that I had to do it. In fact, I thought that the intake process was a screening process so that I met the minimum requirements for ballot access. So I thought when I was done with that that I was done....

*N.T.*, April 3, 2013, at 192. In point of fact, Mr. Guzzardi candidly assumed responsibility for his failure in such regard:

Q: ... [Y]ou did not, though, pay attention to the detail with the statement of financial interests, correct?

A: That's correct. You're hammering me, but it's obvious I made a mistake. I should have seen it. It was there to be seen. I didn't see it. I made a mistake. The record is what the record is. You've correctly stated the record.

\* \* \*

Q: ... Who was responsible in your campaign to file the statement of financial interests with the Ethics Commission?

A: Me.

N.T., April 2, 2014, at 189–190; N.T., April 3, 2014, at 202–03.

Upon these concessions alone, it seems clear to us that a finding of no negligence, on Mr. Guzzardi's part, is unsustainable. The dissenting position apparently is grounded on the testimony from an aide to Mr. Guzzardi to the effect that, while at the Department of State, in a conversation with another person which was overheard by Mr. Guzzardi, the aide had volunteered to take Mr. Guzzardi's statement of financial interests to the Ethics Commission. *See* N.T., April 2, 2014, at 234. The aide indicated that he was "stopped in [his] tracks," *id.* at 235, however, because a Department-of-State employee—described only as a young woman with dark hair, *see id.* at 238—told him this was unnecessary, *see id.* at 234–35. The aide also stated that he did not attempt to verify this information or discuss it with Mr. Guzzardi, because he "was not in command and control of the campaign," and was "not the candidate for governor." *Id.* at 241, 245. Furthermore, the aide denied having ever been instructed or asked to file

Mr. Guzzardi's statement of financial interests. *Id.* at 245. Mr. Guzzardi, for his part, indicated that he did not overhear any conversation between the aide and the Department–of–State employee, *see* N.T., April 3, 2014, at 190, and, as previously indicated, he assumed responsibility for the filing of his own documents.

From our point of view, even if there was some miscommunication at the Department–of–State remote to Mr. Guzzardi,[6] this does not offset the underlying, self-acknowledged mistake on the part of the person who was "in command and control" and who was "the candidate for governor" in failing to apprehend, from the outset, the express statutory requirement to file a statement of financial interests with the Ethics Commission.[7] Particularly as Mr. Guzzardi took responsibility for his failure in this regard, it is unclear why the dissents find this to be of no material significance to its assessment of his negligence.[8]

6. The objectors presented testimony from Department–of–State personnel which is in substantial tension with such finding, *see, e.g.,* N.T., April 3, 2014, at 211–224; however, we recognize that the Commonwealth Court did make a credibility determination accepting the aide's testimony.

7. As reflected above, the purport of Mr. Guzzardi's own testimony was not that he failed to file on account of misinformation gained from the Department of State; rather, it was that he failed to file because he misunderstood basic filing requirements which he should have apprehended from the outset. *See, e.g.,* N.T., April 2, 2014, at 189–190.

8. In its rejoinder, the dissents posit that the Commonwealth Court's ruling is insulated by a credibility determination rejecting Mr. Guzzardi's own testimony in favor of inconsistent evidence (presumably the testimony of Mr. Guzzardi's aide). *See* Dissenting Opinion, at 18 n. 1, 99 A.3d at 391 n. 1 (Baer, J.). In point of fact, however, there is little if anything inconsistent as between the aide's recounting (including that he never was assigned by Mr. Guzzardi to file the statement of financial interests with the Ethics Commission and, accordingly, he never told Mr. Guzzardi upon hearing the filing was unnecessary), and Mr. Guzzardi's testimony (*e.g.,* that he never appreciated from the outset that he was responsible to file his statement with the Ethics Commission, he never set out to do so, his aide never told him the filing was unnecessary, and, thus, based on his own mistake, he failed to accomplish the necessary filing). Indeed, in no way did the Commonwealth Court attempt to identify some conflict as between these two lines of evidence and credit one over the other. Rather, dispositionally, the court merely omitted any treatment of Mr. Guzzardi's own undisputed testimony

14

In summary, there is no dispute here that the statutory fatal-defect rule applied squarely in Mr. Guzzardi's circumstances, on account of his failure to timely file a statement of financial interests with the Commission. Moreover, Appellants lodged timely objections to his nomination petition, bringing the matter squarely before the Commonwealth Court. In the circumstances, the Commonwealth Court erred in refusing to enforce the governing statutory command.

Chief Justice CASTILLE and Justices EAKIN, McCAFFERY and STEVENS join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice STEVENS joins.

Justice BAER files a dissenting opinion in which Justice TODD joins.

Justice TODD files a dissenting opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion, which accurately sets forth the proper approach to late filings of statements of financial interests and fact-intensive equitable exceptions to clear statutory language. That equitable approaches are unwieldy and can lead to inconsistent results is borne out by the circumstances of this case. I do not believe that placement on the ballot should depend upon credibility determinations of a court—acting in the compressed time-frame in which all elec-

reflective of his negligence. From our point of view, such analysis is grounded in abstraction, not closely rendered credibility based decision-making.

Since the Commonwealth Court did not affirmatively reject Mr. Guzzardi's own testimony, at best, the court's analysis reflects that the filing of Mr. Guzzardi's statement of financial interests would have occurred in spite of his undisputed misapprehension and mistake, had his aide not been remotely misinformed. From our point of view, such prevailing circumstances cannot be characterized aptly as non-negligent.

Moreover, these sorts of efforts to work around undisputed record evidence in support of a particular finding amply illustrate the shortcomings of applying equitable principles to circumvent the legislative fatal-defect rule, thus injecting "ambiguity and inconsistency in what needs to be a uniform and stable area of law." *Butts*, 5 A.3d at 943 n. 16 (citation omitted).

tion cases are prosecuted—weighing non-textual "exceptions" to clear statutory mandates. I thus agree that Robert Guzzardi's untimely filing with the Ethics Commission was fatal to his candidacy.

I also write to note that, in my view, Guzzardi's nomination petition was deficient for an additional reason. For the reasons set forth in my Dissenting Statement in *In re Rankin*, 583 Pa. 38, 874 A.2d 1145, 1145–48 (2005), I would also hold that, when Guzzardi identified himself as a "semi-retired businessman and lawyer" on his nomination petition, he misrepresented his occupation and misled the electors who signed his petition. In proceedings before the Commonwealth Court, Guzzardi testified that he is a "lawyer on inactive status" who has not "practiced in a number of years, three or four at least." N.T., 4/3/14, at 177. As all Pennsylvania lawyers know, there is no "semi-retired lawyer" status for members of the Pennsylvania Bar; attorneys are either active or inactive. At least one grammatically correct reading of the notation "semi-retired businessman and lawyer" indicates that Guzzardi is practicing law on a part-time basis; another fair reading would be that he was semi-retired from business, but still a lawyer. Either reading by an elector would reveal that the elector had been misled by the candidate, who was inactive and not licensed to practice law, on either a full-time or "semi-retired" basis.

In *Rankin*, a candidate for the office of Magisterial District Justice was on inactive status as an attorney for a number of years before she filed her nomination petition, which listed her current occupation as "attorney/publisher." The trial court held that, as a result, electors who signed Rankin's nomination petition were "falsely led to believe that [she] was a practicing attorney." 874 A.2d at 1146 (Castille, J., dissenting). On appeal, a single judge of the Commonwealth Court reversed in an unpublished memorandum opinion, allowing the candidate to remain on the election ballot. This Court declined to exercise discretionary review over that decision, leaving the legal question open for determination another day.

That day has come in an appeal before us as a matter of right; and I stand by my view in *Rankin,* although the facts are slightly different here. In my *Rankin* dissent, I explained why I agreed with the trial court's holding that the candidate's nomination petition should have been set aside, as follows:

> Words are a lawyer's standard in trade, and lawyers should be held to their meaning. A former occupation is not a current occupation. A conditional or equivocal status is not an unequivocal one. And even formerly admitted attorneys are expected to know how to comport themselves—at least when it comes to representation of their status as lawyers. What respondent viewed as an "explanation" of her conduct at the hearing below, properly understood, was a confession. During the hearing, respondent testified as follows[:] "I tell everybody that I practiced law until four years ago, and then I began publishing the newspaper." But, that is not what her nominating petitions demonstrate. Respondent did not have personal contact with every elector who signed her petitions to inform them, contrary to what the petition said, that she was actually a "formerly admitted attorney." Instead, she created a false impression that she was a practicing attorney. How was the electorate to know that respondent was not admitted to practice in Pennsylvania, and furthermore, was in apparent violation of disciplinary and ethical rules for holding herself out as such?

874 A.2d at 1148 (citations omitted).

In this case, Guzzardi used the qualifying term "semi-retired" when identifying his occupation, without making clear whether semi-retired applied to his being a business person or both a business person and a lawyer. Even if the qualification is read as applying to both professions, there is no reason to expect that the electors who signed his petition understood the meaning of this ambiguous term, which has no relevant meaning in terms of an actual status within the Pennsylvania Bar. The fact that a candidate for Governor is a lawyer obviously would be a material consideration for electors. Guzzardi's description of his occupation was misleading and improper,

and thus serves as an independent, additional ground to order that Guzzardi's nomination petition be set aside.

Justice STEVENS joins this concurring opinion.

Justice BAER, dissenting.

I respectfully dissent. The majority holds that Pennsylvania courts may never, under any circumstances, invoke equity, specifically *nunc pro tunc* principles, to excuse a candidate's untimely filing of a statement of financial interests with the Ethics Commission because to do so would override the Legislative pronouncement in Section 1104(b)(3) of the Ethics Act that such omission "shall . . . be a fatal defect to a petition to appear on the ballot." 65 Pa.C.S. § 1104(b)(3). Adoption of such a harsh and inflexible rule runs counter to this Court's pronouncement that the strict disclosure requirements of the Ethics Act must be balanced with the liberal construction required under the Election Code in favor of ballot access. *In re Nomination of Paulmier*, 594 Pa. 433, 937 A.2d 364, 370–71 (2007). Further, such ruling fails to appreciate that applying *nunc pro tunc* principles to the instant case does not relax the stringent statutory requirement of filing a timely statement of financial interests with the Ethics Commission, but rather recognizes that the candidate did not satisfy the statutory requirement here because there was a breakdown in the administrative process. Finally, because the cases relied upon by the majority to preclude application of *nunc pro tunc* principles did not, in fact, involve requests for *nunc pro tunc* relief, in my view, they cannot foreclose the grant of equitable remedies when sought in the appropriate case.

Accordingly, I would adhere to the rule of law as set forth by the Commonwealth Court in this case as well as in prior published decisions, holding that a candidate's failure to file a timely financial statement with the Ethics Commission can be cured *nunc pro tunc* if the untimeliness is due to non-negligent circumstances, the filing is accomplished within a very short duration after the party learns of and has an opportunity to address the untimeliness, and the opposing party is not prejudiced by the delay in filing. *See e.g., In re*

*Nomination Petitions of Howells,* 20 A.3d 617, 621–22 (Pa. Cmwlth.), *aff'd per curiam,* 611 Pa. 559, 28 A.3d 915 (2011).

That standard is satisfied here because, following an evidentiary hearing and credibility determinations, the Commonwealth Court determined as a matter of fact that Robert Guzzardi ("Candidate") was present in the Office of the Department of State, Board of Commissions, Elections, and Legislation, to file his nomination petition for the office of governor and his aide was prepared to file a timely statement of financial interests with the Ethics Commission when a Department of State employee volunteered misinformation that such filing was unnecessary because the Department of State could accept the filing. The Commonwealth Court also concluded that no prejudice arose from the late filing because Candidate's financial statement became publically available when it was filed timely with the Department of State, and Candidate corrected the omission promptly by filing a financial statement the day after learning that the advice given to him by Department of State employee was erroneous. Because these findings are supported by the record, I would affirm the order of the Commonwealth Court, which denied Objectors' petition to set aside Candidate's nomination petition.[1]

As noted by the majority, this case involves the statutory interpretation of Section 1104(b) of the Ethics Act, which

---

1. In entertaining the possibility of *nunc pro tunc* relief, the majority cites Candidate's testimony that he was not personally aware of the need to file his statement of financial interests with the Ethics Commission for the proposition that Candidate should not, therefore, be able to claim a non-negligent administrative breakdown leading to his failure to file his statement with the Ethics Commission. While the evidence cited by the majority would certainly support this outcome, which is argued by Objectors, there was evidence to support either side's version of events and circumstances on this record. The Commonwealth Court, the ultimate arbiter of fact and credibility, concluded that Candidate's aide was aware of the need to file with the Ethics Commission and was ready to do so but for his reliance upon an election official's erroneous information that filing was unnecessary. Given that the Commonwealth Court chose to believe Candidate's aide's testimony to support its ultimate decision, this Court is not at liberty to reexamine the record and cite conflicting evidence to support a contrary outcome.

requires candidates for state-level public office to file a timely statement of financial interests with the Ethics Commission, and append a copy of the financial statement to the nomination petition filed with the Department of State.[2] Relevant here is Section 1104(b)(3), which declares that the "[f]ailure to file the statement [of financial interests] in accordance with the provisions of this chapter shall ... be a fatal defect to a petition to appear on the ballot." 65 Pa.C.S. § 1104(b)(3).

The majority's interpretation of Section 1104(b) is straightforward and has some facial appeal. It reasons that because the Legislature deemed the failure to file a timely financial statement with the Ethics Commission a "fatal defect" to the candidate's nomination petition, such omission can never be cured even, as here, through appeal to equitable principles. The theory is that "fatal defect" means not subject to amendment or cure, and that the case law of this Court confirms such interpretation. The majority posits that it was this Court's disapproval of a "fatal defect" approach when interpreting the predecessor to Section 1104(b)(3) in *State Ethics Commission v. Baldwin*, 498 Pa. 255, 445 A.2d 1208 (1982), *superseded by statute as recognized* in *In re Petition of Cioppa*, 533 Pa. 564, 626 A.2d 146, 148–149 (1993) (plurality), which led the General Assembly to adopt the "fatal defect" language at issue herein.[3] After an examination of the relevant case law, however, I respectfully disagree.

2. The relevant provisions of Section 1104(b) provide as follows:

Any candidate for a State-level public office shall file a statement of financial interests for the preceding calendar year with the [Ethics] commission on or before the last day for filing a petition to appear on the ballot for election. A copy of the statement of financial interests shall also be appended to such petition.

\*　　\*　　\*

No petition to appear on the ballot for election shall be accepted by the respective State or local election officials unless the petition has appended thereto a statement of financial interests as set forth in paragraphs (1) and (2). Failure to file the statement in accordance with the provisions of this chapter shall, in addition to any other penalties provided, be a fatal defect to appear on the ballot.
65 Pa.C.S. § 1104(b)(1), (3).

3. Objectors herein rely on expressions in the plurality decision in *Cioppa* as supporting their position that the "fatal defect" language in

While the General Assembly's insertion of the "fatal defect" language in Section 1104(b)(3) may have been a legislative response to our opinion in *Baldwin*, the crux of my dissension lies in what this Court held in *Baldwin*, and, thus, what the General Assembly was "correcting" by employing the "fatal defect" language. In *Baldwin*, the State Ethics Commission challenged the nomination petitions filed by three candidates for state-level offices on the ground that the petitions violated then-Section 4(b) of the Ethics Act because the affidavits submitted with those petitions were false in that they attested that the candidates had filed financial interests statements with the Ethics Commission.[4] The evidence established that while all the candidates had filed their nomination petitions and accompanying affidavits with the Bureau of Elections before the deadline, the Ethics Commission had not received a timely statement of financial interests from any of the candidates. The Commonwealth Court held that Section 4(b) of the Ethics Act required the filing of a financial statement with the Ethics Commission prior to filing the nomination petition, and that the candidates' failure to do so invalidated their affidavits verifying that they had filed such statements and, consequently, invalidated the nomination petitions themselves, which required that the candidates' names be stricken from the ballot.

This Court reversed, characterizing the Commonwealth Court's holding as "stilted and harsh." *Baldwin*, 445 A.2d at

Section 1104(b)(3) precludes the application of *nunc pro tunc* principles to cure a candidate's untimely filing of the statement of financial interests. This contention need not be refuted, however, as *Cioppa* was a plurality opinion, the reasoning of which garnered the joinder of only one Justice besides the author, and, thus, has no precedential value.

4. Section 4(b) of the Ethics Act, the predecessor to Section 1104(b)(3), provided:

(b) Each candidate for public office shall file a statement of financial interests for the preceding calendar year with the commission prior to filing a petition to appear on the ballot for election as a public official. A petition to appear on the ballot shall not be accepted by an election official unless the petition includes an affidavit that the candidate has filed the required statement of financial interests with the commission.

65 P.S. § 404(b), repealed by 1998, Oct. 15, P.L. 729, No. 93, § 6(a)(2).

1210. Relying exclusively on the statutory language of Section 4(b), we held that the failure to file the statements of financial interests with the Ethics Commission did not operate to "fatally taint" the filing process so as to invalidate the nomination petitions as long as the information required by the financial interests statements was received subsequent to the time of filing and was otherwise available for purposes envisioned by the Ethics Act. *Id.* This Court reasoned:

> To treat the affidavit attesting to the financial disclosure as an appendage to the qualifications for office set forth in the Election Code creates a fiction that does a disservice to the legislative intention underlying the enactment of Section 4(b). Section 4(b) was not designed as positing a barrier to seeking public office, rather it was conceived as a way in which to obtain further information which could be available during the selection process.

*Id.*

Accordingly, this Court in *Baldwin* relaxed the statutory requirement of filing a timely statement of financial interests with the Ethics Commission. We held that where there was no intent to deceive on the part of the candidate, the late filing of a financial disclosure statement, due to the candidate's carelessness or lack of due diligence, was of no consequence if the filing was subsequently made and the candidate's financial information was ultimately disclosed. Significantly, we did not discuss principles of equity or the grant of *nunc pro tunc* relief, as equitable relief was not sought, and the case involved exclusively the interpretation of the statutory language.[5]

Thus, in my opinion, the General Assembly's adoption of the "fatal defect" language in Section 1104(b)(3) was in response to this Court's relaxation of the statutory requirement of filing a timely statement of financial interests with the Ethics

---

5. The Court in *Baldwin* recognized that some of the candidates did not receive the proper form to file the financial statement, and there was some uncertainty regarding compliance with the filing requirement. 445 A.2d at 1211–12. However, the Court utilized these facts as a basis to interpret the statutory provision liberally in favor of allowing an untimely filing, and did not invoke the equitable principles of *nunc pro tunc,* as Candidate does in the instant case.

Commission. The General Assembly categorized the failure to file a financial statement as a "fatal defect" to clarify that, contrary to this Court's holding in *Baldwin*, the filing of a timely financial statement is, in fact, a prerequisite to seeking public office. It is unlikely that the legislature's action in this regard was done to preclude application of equitable principles where the late filing was due to extraordinary circumstances such as a breakdown of the administrative process, as is the case here, because no such request had been made in *Baldwin*, and, simply put, the issue of granting equitable relief was not in the case. Thus, unlike the majority, I am not persuaded that the foreclosure of *nunc pro tunc* relief was the "mischief" that the General Assembly intended to remedy by adopting the "fatal defect" language.[6]

Further, as noted, I do not view the general application of *nunc pro tunc* principles as relaxing statutory prerequisites, but rather as an acknowledgement that the statutory requirement exists, but was not satisfied in the particular case because of extraordinary circumstances, such as a breakdown of the administrative process. My point is illustrated by our decision in *Cook v. Unemployment Compensation Board of Review*, 543 Pa. 381, 671 A.2d 1130 (1996), where the issue was whether an appellant could obtain *nunc pro tunc* relief after he filed an appeal from the denial of unemployment compensation benefits outside the time period established by the Unemployment Compensation Law.[7] This Court rejected the unemployment compensation referee's conclusion that the existence of a mandatory, legislative appeal period foreclosed the grant of *nunc pro tunc* relief. Based on our previous decision in

6. For this same reason, our holding in *Paulmier*, *i.e.*, that the fatal defect rule applies to untimely filings, rather than defective ones, does not suggest that Section 1104(b)(3) forecloses equitable relief. As set forth *supra* at 390–91, I believe *Paulmier* supports, rather than refutes the application of equity under the facts presented because it recognizes that the strict disclosure requirements of the Ethics Act must be balanced with the liberal construction required under the Election Code in favor of ballot access. *Id.* at 370–71.

7. Of course, Cook did not involve the "fatal defect" language at issue herein, but is cited to demonstrate that this Court has employed equity in the face of mandatory legislative timeliness requirements when justice so requires.

*Bass v. Commonwealth Bureau of Corrections, et al.,* 485 Pa. 256, 401 A.2d 1133 (1979),[8] we concluded that *nunc pro tunc* relief was warranted because the appellant took steps to appeal the determination; was unable to perfect his appeal due to the sudden onset of a medical condition, which required his hospitalized until after the statutory appeal period had expired; and that the appellant pursued his appeal promptly upon his release from the hospital, resulting in no prejudice to appellee.

The Commonwealth Court adopted this same equitable approach in the context of Section 1104(b)(3) of the Ethics Act in the case of *In re Nomination Petitions of Howells,* 20 A.3d 617, 621–22 (Pa.Cmwlth.), *aff'd per curiam,* 611 Pa. 559, 28 A.3d 915 (2011), which is on all fours with the instant case. There, an official with the Election Commission informed a judicial candidate that he need not file a statement of financial interests with the Ethics Commission under Section 1104(b) of the Ethics Act. The candidate relied on this erroneous advice and failed to file a timely financial statement. The day after the filing deadline, the Election Commission realized its mistake and notified the candidate, who filed the statement of financial interests the next day. Objectors subsequently filed a petition challenging the candidate's nomination petition based on the candidate's failure to comply with Section 1104(b). The trial court denied the objectors' petition, and held that the candidate was entitled to *nunc pro tunc* relief based on his reasonable reliance upon erroneous information given to him by an election official.

The Commonwealth Court affirmed. It acknowledged that the failure to file a financial statement constituted a fatal defect to the nomination petition under Section 1104(b), and that this Court interpreted Section 1104(b) in *Paulmier, supra,* as precluding candidates from the ballot who failed to file timely statements of financial interests. It clarified, however,

8. This Court held in *Bass* that a court may allow an appeal *nunc pro tunc* where the appeal is untimely due to non-negligent circumstances, the appeal is filed within a short time after the appellant learns of and has an opportunity to address the untimeliness, and the appellee is not prejudiced by the delay.

that the question before it was "not whether the failure to timely file a statement of financial interests is a fatal defect—it is—but whether, under certain circumstances, such a defect may be cured *nunc pro tunc.*" *Id.* at 621.

The Commonwealth Court in *Howells* relied on its previous decision in *Appeal of Fairview Associates, Inc.,* 61 Pa.Cmwlth. 404, 433 A.2d 929 (1981), which permitted amendment of a nomination petition *nunc pro tunc* when a party's defective petition resulted from its reasonable reliance on incorrect information provided by the Board of Elections. The *Howells* court explained that the "clear public policy favoring access to the voting franchise militates in favor of a conclusion that the public should reasonably be expected to rely on statements from the Election Commission employees acting in their official capacities." *Howells,* 20 A.3d at 623. The *Howells* court concluded that the legislative intent recognized by this Court in *Paulmier,* to encourage both full financial disclosure and protect voters' choice, is fulfilled where the candidate files the statement of financial interests shortly after learning of the Election Commission's error and within three days of the statutory deadline.[9]

The majority rejects this established and well-reasoned jurisprudence, upon which the Commonwealth Court in the instant case justifiably relied given that the court was obligated to follow its own binding precedent, in favor of a severe *per se* rule precluding the application of equitable principles in any case involving the untimely filing of a statement of financial interests under Section 1104(b)(3). I find this result to be unnecessarily harsh and inequitable as demonstrated by the facts of this case where the exclusive reason for the untimely filing was the erroneous advice offered by the Department of State employee. I agree with the Commonwealth Court's assessment that what occurred here constitutes a breakdown in the administrative process, which is clearly a non-negligent reason for the delay in filing. As espoused by the Commonwealth Court in *Howells,* Candidates should be able to rely on

9. This author joined in the unanimous *per curiam* order of affirmance in *Howells.*

information given to them by Department of State employees acting in their official capacity at the filing office.

It is not beyond the imagination to contemplate other non-negligent scenarios that would prevent the timely filing of a financial statement with the Ethics Commission, such as a natural disaster, fire, or bomb threat in the filing office, which would preclude candidates from entering the building to file their statement of financial interests on the statutory filing deadline. Surely, the legislature could not have intended to remove from the ballot those prospective candidates who find themselves in such unfortunate circumstances.

While I share the majority's sentiment that legislative governance of elections foster orderly, efficient, and fair proceedings, Op. at 8–9, 99 A.3d at 385, I cannot agree that such governance eliminates the ability of this Court to apply traditional principles of equity to grant *nunc pro tunc* relief in the appropriate case. I emphasize that the exception should never be applied to swallow the rule, and that *nunc pro tunc* relief should only be granted in the rare case where the Candidate has attempted to file the statement of financial interests with the Ethics Commission and some unforeseen event has occurred that prevented the filing. *See Criss v. Wise*, 566 Pa. 437, 781 A.2d 1156, 1160 (2001) (holding that "[t]he exception for allowance of an appeal *nunc pro tunc* in non-negligent circumstances is meant to apply only in unique and compelling cases in which the appellant has clearly established that she attempted to file an appeal, but unforeseeable and unavoidable events precluded her from actually doing so.").[10]

In sum, rather than "refus[ing] to enforce the governing legislative directive," Op. at 4, 99 A.3d at 383, I believe the Commonwealth Court below ruled properly in accordance with that court's binding jurisprudence applying *nunc pro tunc* principles where a candidate, due to non-negligent reasons, failed to file a timely statement of financial interests with the

10. Additionally, as noted, the Candidate must also demonstrate that the filing is accomplished within a very short time after the Candidate learns of and has an opportunity to address the untimeliness, and the opposing party is not prejudiced by the delay in filing.

Ethics Commission, and rectified that mistake promptly upon learning of the error, without prejudicing any party.

Accordingly, I dissent.

Justice TODD joins this dissenting opinion.

Justice TODD, dissenting.

I join Justice Baer's Dissenting Opinion. I write separately to address two points raised by the majority.

First, the majority notes that "[s]ince the present situation is vastly different from the 'natural disaster, fire, or bomb threat' scenarios envisioned by the dissent, we do not address those here." Majority Opinion at 10–11 n. 5, 99 A.3d at 386 n. 5 (citation omitted). Admittedly, an appeal for *nunc pro tunc* relief because "I was misinformed" (as herein) is "different" from an appeal for *nunc pro tunc* relief because, for example, a fire prevented access to the filing office, as the latter claim appears to present a much stronger case for granting *nunc pro tunc* relief than the former. But, significantly, from the standpoint of whether equity is available to provide the requested relief, the claims are the same. If, as the majority holds, equity is not available under its construction of the election statute, the particular details underlying the claim— be it official misinformation, or disaster—are irrelevant. *Cf.* Majority Opinion at 10, 99 A.3d at 387 (conceding that "our enforcement of the governing statutory fatal-defect rule was dispositive of this appeal"). Thus, an appeal to equity such as made in this case and an appeal to equity because of a fire at the filing office are emphatically not "vastly different"—they are, in point of fact, identical legal claims. As a result, the majority's contention that "we do not address those [claims] here" rings hollow, as I perceive no principled basis—and the majority offers none—for categorically distinguishing between the instant claim for *nunc pro tunc* relief and one based on the "natural disaster, fire, or bomb threat" scenarios proffered by Justice Baer.[1] Under the majority's analysis, all are barred.

1. If the majority's distinction is meant to signal that its fatal defect interpretation somehow may not be as absolute as it appears to be—i.e.,

Relatedly, the majority goes on to state: "We reiterate, however, that judicial enforcement of the fatal-defect rule extends only to the limits of the federal and state Constitutions and recognize that such enforcement in impossibility scenarios may test such boundaries." Id. at 10–11 n. 5, 99 A.3d at 386 n. 5. I take this to mean that the majority recognizes that its interpretation of the statute may be so unfair in its application in certain scenarios that it could be unconstitutional. On the majority's terms, I would agree. However, this constitutional-safety-value tack reveals another problem with the majority's approach, in addition to those identified by Justice Baer.

A cardinal presumption of statutory interpretation is that the legislature does not intend to violate the Constitution. 1 Pa.C.S.A. § 1922(3) ("[T]he General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *Bricklayers of W. Pennsylvania Combined Funds, Inc. v. Scott's Dev. Co.,* 625 Pa. 26, 90 A.3d 682, 692 (2014) ("The Legislature is presumed not to intentionally pass unconstitutional laws, and courts give statutes a constitutional interpretation if that is reasonably possible."). In my view, the majority's interpretation of the fatal defect language violates this precept. In addition to the natural disaster, fire, or bomb threat scenarios suggested by Justice Baer, I would add the much more prosaic power outage, snow storm (filings are due in late winter), or water line break. In brief, short of negligence, there are any number of highly foreseeable events that could hamper or prevent the timely filing of a statement of financial interests. Surely, the legislature must have been aware of such possibilities in crafting the fatal defect language. However, by concluding the legislature intended to preclude equitable relief in *toto,* the majority nearly guarantees a constitutional contravention, flouting the above precept of statutory construction.

In this regard, I do not mean to suggest the majority's interpretation of the fatal defect language is unfounded: such language can reasonably be viewed as disallowing equitable

that it contemplates that some equity claims may be more worthy than others—it should say so explicitly.

relief. At the same time, I regard Justice Baer's alternative interpretation—that the fatal defect language was added to reverse this Court's *dilution* of the filing requirement in *State Ethics Comm'n v. Baldwin,* 498 Pa. 255, 445 A.2d 1208 (1982), and thus is unrelated to restricting a court's ability to grant equitable relief—also to be eminently reasonable. Yet, critically, Justice Baer's interpretation has the advantage of avoiding the constitutional infirmity to which the majority alludes, and so comports with the presumption against unconstitutional interpretations. Given the panoply of highly foreseeable scenarios which may result in a non-negligent failure to timely file a statement of financial interests, I would interpret the fatal defect language in a manner which avoids, not presumes, constitutional impediments.