**[J-59-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**


| | | |
|---|---|---|
| IN RE: CANVASS OF PROVISIONAL BALLOTS IN THE 2024 PRIMARY ELECTION | : | No. 55 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at 628 CD |
| | : | 2024 dated July 1, 2024 Reversing |
| APPEAL OF: JAMIE WALSH | : | the Order of the Luzerne County |
| | : | Court of Common Pleas, Civil |
| | : | Division, at 2024-05082 dated May |
| | : | 15, 2024. |
| | : | |
| | : | SUBMITTED: August 7, 2024 |


**OPINION**


**JUSTICE MUNDY**                                              **DECIDED: September 13, 2024**

In this appeal by allowance, Appellant Jamie Walsh challenges the Commonwealth Court's ruling that a particular provisional ballot cast in Luzerne County should not be counted because the outer envelope was unsigned. He also disputes that court's separate ruling that a different provisional ballot should be counted because the voter resided in the election district within 30 days before the date of the election.

**I. Background**

Walsh and Mike Cabell competed in the April 23, 2024, primary election for the Republican nomination to represent the 117th District in Pennsylvania's House of Representatives. Several dozen provisional ballots were returned by voting districts in Luzerne County. Walsh led Cabell by three votes before any of them were counted. On April 29, 2024, the Luzerne County Board of Elections began hearings for interested parties to review the provisional ballots. Cabell challenged a ballot submitted by Timothy

Wagner on the basis that the envelope was not signed, and Walsh challenged a provisional ballot submitted by Shane O'Donnell, who was registered to vote in McAdoo, Schuylkill County. The Board ultimately determined the Wagner ballot should be counted, but the O'Donnell ballot should not be counted.

Cabell appealed to the common pleas court, which held a hearing at which Wagner and O'Donnell provided testimony. Wagner testified that on election day he went to the polling place and was informed by a poll worker that because he had been issued a mail-in ballot, but did not return it, he would have to vote by provisional ballot. He followed the election worker's instructions in completing the ballot, placing it in a secrecy envelope, and placing that envelope in an outer envelope, the latter of which he was required by law to sign. *See* 25 P.S. § 3050(a.4)(3) (discussed below). Wagner later called a phone number he was given at the polling place and was told his ballot had been accepted. At the hearing Wagner could not remember whether he had signed the outer envelope, and he thought he "probably" did, *see* N.T., May 9, 2024, at 22, but it turned out he did not. In the end, because there was no evidence of fraud and Wagner's intent to vote for Walsh was clear, the county court affirmed the Board's decision to canvass the ballot.

O'Donnell testified that he appeared at his polling place in Butler Township, Luzerne County on election day but the poll workers could not find his name on the voter list. They let him vote by provisional ballot because he had previously voted in the district. O'Donnell had purchased a home in McAdoo in June 2023, but he resided with his mother and brother in Butler Township from that point until March 29, 2024, while his new home underwent renovations. O'Donnell noted he had changed the address for his vehicle registration in December 2023, and he expressed that PennDOT must have made the change to his voter registration at that time.[1] Although March 29 was less than 30 days

---

[1] An election official testified this was consistent with PennDOT's practice.

before the election, the trial court affirmed the Board's decision not to count his vote because that decision did not disenfranchise O'Donnell inasmuch as he could have voted in his new district in Schuylkill County.

A divided three-judge panel of the Commonwealth Court reversed both rulings in a memorandum opinion. *In re Canvass of Provisional Ballots in the 2024 Primary Election*, No. 628 C.D. 2024, 2024 WL 3252970 (Pa. Cmwlth. July 1, 2024) ("*Luzerne Provisional 2024*"). In relation to the Wagner ballot, the majority acknowledged that where the language of the Election Code is uncertain, it should be interpreted liberally in favor of the right to vote. Here, however, the Election Code states a provisional ballot "shall not be counted" if the voter fails to sign the envelope. 25 P.S. § 3050(a.4)(5)(ii). Based on the plain language of that provision, the majority held Wagner's ballot should not be counted. In reaching its holding, the majority quoted from a prior unpublished decision in which it had arrived at the same conclusion. *See Luzerne Provisional 2024*, 2024 WL 3252970, at *4 (quoting *In re: Allegheny Cnty. Provisional Ballots in the 2020 Gen. Election*, No. 1161 C.D. 2020, *slip op.* at 7-9 (Pa. Cmwlth. Nov. 20, 2020) ("*Allegheny Provisional 2020*"), *alloc. denied*, 242 A.3d 307 (Pa. 2020)).[2]

Regarding the O'Donnell ballot, the majority pointed out that under Section 701(3) of the Election Code a person who moves out of his voting district within 30 days prior to the election is allowed to vote in his old district. *See* 25 P.S. § 2811(3). Because O'Donnell moved into his new home less than 30 days before the election, the majority held the trial court erred by excluding his ballot. *See Luzerne Provisional 2024*, 2024 WL 3252970, at *5.

---

[2] The court noted it may reference such unreported decisions for their persuasive value. *See id.* at 7 n.7 (citing 210 Pa. Code § 69.414(a)).

Judge Wolf filed a responsive opinion in which he joined the majority with regard to the counting of the O'Donnell ballot but dissented as to the Wagner ballot. *See id.* at *5-*7. In this respect, he focused on the precept that election laws should be construed liberally in favor of the right to vote, and he characterized Wagner's failure to sign the envelope as a technicality. Given that Wagner's testimony made his electoral intent clear (to vote for Walsh) and given that Wagner had followed the instructions of the poll workers, Judge Wolf opined Wagner's ballot should be canvassed. As to the *Allegheny Provisional 2020* decision, he expressed that Judge Wojcik issued a dissenting opinion in that matter faithfully applying this Court's precedent which suggests courts should not "blithely disenfranchise" voters who "merely neglected to enter a signature" on one of the documents. *Id.* at *7 (quoting *Allegheny Provisional 2020*, *slip op.* at 5 (Wojcik, J., dissenting)).

We granted Walsh's petition for allowance of appeal in which he raised the following issues:

> Whether an unsigned provisional ballot should be counted where the voter demonstrated "exceedingly clear" electoral intent, acted in conformity with instructions of election officials and subsequently verified that his ballot had been counted?

> Whether a provisional ballot submitted by a voter domiciled and registered to vote elsewhere should be rejected?

*See In re: Canvass of Provisional Ballots in the 2024 Primary Election (Petition of Walsh)*, ___ A.3d ___, 2024 WL 3517407 (Pa. July 24, 2024) (*per curiam).*

## II. The Wagner ballot

Walsh contends that where a voter's intent is clear, there is no fraud, the voter follows the direction of election officials, and later verifies his vote was accepted, his vote should be canvassed. He acknowledges that *Allegheny Provisional 2020*, on which the panel below relied, held such votes should not be counted, but he points out that decision

was unpublished, and thus, non-binding. Furthermore, Walsh posits that it appears to conflict with this Court's ruling in *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, 241 A.3d 1058 (Pa. 2020) ("*Absentee & Mail-In 2020*"), which reinforced that wherever possible, provisions regulating the elective franchise should

> be so construed as to insure rather than defeat the exercise of the right of suffrage. Technicalities should not be used to make the right of the voter insecure. No construction of a statute should be indulged that would disfranchise any voter if the law is reasonably susceptible of any other meaning.

*Id.* at 1062 (Opinion Announcing the Judgment of the Court) (quoting *Appeal of James*, 105 A.2d 64, 65-66 (Pa. 1954)).

Walsh portrays *Absentee & Mail-In 2020* as holding that, although the Election Code used "shall" with respect to dating absentee and mail-in ballot envelopes, the word was held to be directory and not mandatory because the date was "unnecessary." This meant ballots lacking a hand-written date should be counted notwithstanding the statutory "shall." Walsh argues Wagner's signature was likewise unnecessary as his name was already on the list of persons to receive a mail-in ballot, and then he showed up in person to vote by provisional ballot. *See* Brief for Appellant at 17-18 (citing *Absentee & Mail-In 2020*, 241 A.3d at 1076-77). Walsh additionally emphasizes Wagner provided a fully-executed affidavit attesting that the ballot was the only one he submitted in that election. *See* 24 P.S. § 3050(a.4)(2). As such, Walsh characterizes the envelope signature requirement as "unnecessary and superfluous." Brief for Appellant at 19.

The Luzerne County Board of Elections has filed a brief denominated as an Appellee's brief, although it favors reversal of the Commonwealth Court's ruling as to the Wagner ballot. In its brief, the Board largely agrees with Walsh's arguments, but it adds

that under the Free and Equal Elections Clause,[3] the electoral process must, "to the greatest degree possible, be kept open and unrestricted." Brief for Appellee (Board) at 16 (quoting *League of Women Voters v. Commonwealth*, 178 A.d 737, 804 (Pa. 2018)). In this vein, the Board suggests voting regulations are constitutionally suspect if they "deny the franchise itself, or make it so difficult as to amount to a denial." *Id.* (quoting *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914)).[4]

Article XII of the Pennsylvania Election Code[5] relates to the conduct of primaries and elections.[6] Within Article XII, Section 1210 lists, *inter alia*, the steps for voting by provisional ballot. *See* 25 P.S. § 3050. When an elector arrives at the polling place, if there is any doubt about his eligibility to vote, he may cast a provisional ballot. *See id.* § 3050(a.2). Before doing so, pursuant to paragraph (a.4) he must execute an affidavit giving information such as his name, date of birth, and address at the time of registration. *See id.* § 3050(a.4)(2). Paragraph (a.4) continues, in relevant part:

---

[3] PA. CONST. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.").

[4] The Pennsylvania Department of State and Secretary of the Commonwealth Al Schmidt have filed a joint amicus brief arguing the Wagner ballot should be counted, but the O'Donnell ballot should not. As well, the Democratic National Committee and the Pennsylvania Democratic Party have filed a joint amicus brief in favor of counting the Wagner ballot while taking no position on the O'Donnell ballot.

Separately, In This Together Northeast PA, which also supports the counting of the Wagner ballot, seeks leave to file an amicus brief out of time. The parties have all filed no-answer letters. Leave to file is granted in light of multiple factors: the condensed briefing schedule, the filing of the brief before Cabell's brief was due, and the parties' decision not to object.

[5] Act of June 3, 1937, P.L. 1333, No. 320 (as amended 25 P.S. §§ 2601-3591).

[6] Under the Election Code, "election" is defined as "any general, municipal, special or primary election, unless otherwise specified." 24 P.S. § 2602. Nothing in Article XII or Section 1210 specifies any other meaning.

(3) After casting the provisional ballot, the individual shall place it in a secrecy envelope. The individual shall place the secrecy envelope in the provisional ballot envelope **and shall place his signature on the front of the provisional ballot envelope**. All provisional ballots shall remain sealed in their provisional ballot envelopes for return to the county board of elections.

\* \* \* \* \*

(5)(i) Except as provided in subclause (ii), if it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, the county board of elections **shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form** and, if the signatures are determined to be genuine, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election.

(ii) **A provisional ballot shall not be counted if:** (A) either **the provisional ballot envelope under clause (3)** or the affidavit under clause (2) **is not signed by the individual**; (B) **the signature required under clause (3) and the signature required under clause (2) are either not genuine or are not executed by the same individual**; . . .

*Id.* § 3050(a.4)(3), (5)(i), (ii)(A), (B) (emphasis added).

Although the above plainly states that an elector voting by provisional ballot "shall" sign the front of the provisional ballot envelope, *id.* § 3050(a.4)(3), there have been times when this Court has interpreted the word "shall" as directory rather than mandatory – meaning the failure to complete the action did not result in the ballot's disqualification. In *Absentee & Mail-In 2020*, we addressed whether county election boards should canvass absentee and mail-in ballots where the declaration on the outer envelope lacked certain information to be supplied by the voter. Some of these items were required under guidance issued by the Secretary of the Commonwealth, while others were mandated by the Election Code itself. In this latter respect, Section 1306(a) specified that, for absentee voters, after placing the secrecy envelope containing the ballot inside the outer envelope, "[t]he elector **shall** then fill out, **date** and sign the declaration printed on such envelope." 25 P.S. §3146.6(a) (emphasis added). Section 1306-D contained an identical instruction

for mail-in voters. *See id.* § 3150.16(a); *see also Absentee & Mail-In 2020*, 241 A.3d at 1063-64 (quoting these provisions).

In that matter, this Court was divided over whether a missing date disqualified a ballot. The three Justices in the plurality concluded the word "shall" in these provisions was directory and not mandatory, reasoning that no "weighty interests" were served by having the elector supply the date. The plurality thus found it would be inappropriate to disqualify the ballot due to the date's omission. *See id.* at 1076-78.[7] Dissenting on that point, three other Justices viewed the date as serving weighty interests such as providing a point in time against which to measure the elector's eligibility to cast the ballot, and ensuring the elector completed it within the proper timeframe. They accordingly viewed the statutory language as mandatory. *See id.* at 1090-91 (Dougherty, J., concurring and dissenting). For his part, Justice Wecht opined the date requirement is "stated in unambiguously mandatory terms," and he observed nothing in the Election Code suggests it should be construed as merely directory. He nonetheless provided the fourth vote for the result, noting he would only apply his interpretation prospectively due to the "circumstances under which the issue has arisen[.]" *Id.* at 1079-80 (Wecht, J., concurring and dissenting); *see also Ball v. Chapman*, 289 A.3d 1, 9-11 (Pa. 2023) (Opinion by Wecht, J., more fully summarizing the judicial expressions in *Absentee & Mail-In 2020*). The upshot is that when we decided *Absentee & Mail-In 2020* four years ago, a majority of this Court agreed that the phrase "shall then . . . date" should, as a matter of

---

[7] *See also Shambach v. Bickhart*, 845 A.2d 793, 801-02 (Pa. 2004) (finding the Election Code's provision that an elector may write in the name of a person not already on the ballot was directory; therefore, write-in votes for a person already on the ballot should be counted – particularly as the Election Code did not specify that such votes should not be counted); *In re Luzerne Cnty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972) (where the Election Code required ballots to be marked in blue, black, or blue-black ink, reasoning the purpose of such provision was to prevent ballots from being identifiable, and holding ballots marked in green or red ink should be counted – particularly as the Election Code did not specify that any other color ink would void the ballot).

Pennsylvania law, be deemed mandatory for all cases subsequent to that decision. *Accord Ball*, 289 A.3d at 28.

Presently, the "shall place his signature" language in paragraph 3050(a.4)(3) is equally clear and unambiguous, and the interests it serves are evident from the statute itself: the Board must compare the signature on the outer envelope with the one on the elector's registration form to assess whether it is genuine and executed by the same person who signed the affidavit. Only then is the board permitted to count the ballot. *See* 25 P.S. § 3050(a.4)(5)(i). *See generally Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (recognizing States have "important regulatory interests" in orderly elections, and those interests are sufficient to justify the enforcement of reasonable, nondiscriminatory rules governing candidate eligibility, voter registration, and the voting process). And Section 1210 buttresses this requirement by directing that a provisional ballot with an unsigned envelope "shall not be counted." *Id.* § 3050(a.4)(5)(ii). The General Assembly has thus spelled out the consequences for an elector's failure to sign the outer envelope – a factor that distinguishes this case from *Absentee & Mail-In 2020*, *Shambach*, and *Luzerne County Return Board*. *See supra* note 7; *see also Oncken v. Ewing*, 8 A.2d 402, 404 (Pa. 1939) ("If the law itself declares a specified [election] irregularity to be fatal the courts will follow that command, irrespective of their views of the importance of the requirement.") (internal quotation marks and citation omitted). Because there is no ambiguity in this language, there is presently no room for application of the concept that "technicalities should not be used to make the right of the voter insecure," *James*, 105 A.2d at 66, or the interpretive principle that the Election Code is subject to a liberal construction in favor of the right to vote. Those precepts are venerable and well established, but they only apply where there is some uncertainty about what the Election Code requires. There is no uncertainty here. *See generally Absentee & Mail-In 2020*,

241 A.3d at 1089 (Wecht, J., concurring) ("In case after case involving the Election Code, . . . we have been reminded how important it is that the General Assembly provide unambiguous guidance for the administration of the election process. But it is imperative that we recognize when the legislature has done precisely that, and resolve not to question the legislature's chosen language when it has done so.").

Because the statute contains no exceptions, moreover, it does not allow for differential treatment where the voter's electoral intent is clear and there is no suggestion of fraud, or where the voter is later informed by telephone that the ballot was accepted. These considerations are presently forwarded as reflecting equitable principles, but we have held that where the General Assembly "has attached specific consequences to particular actions or omissions, Pennsylvania courts may not mitigate the legislatively prescribed outcome through recourse to equity." *In re Guzzardi*, 99 A.3d 381, 386 (Pa. 2014). That being the case, the Board's decision to canvass the Wagner ballot, and the county court's affirmance of that decision, failed to comply with the Election Code's requirements.[8]

In the dissenting portion of her responsive opinion, Justice Donohue proposes that the above procedures do not apply to an elector who is issued a mail-in ballot and then shows up on election day to vote in person. Although such individuals are directed to "vote by provisional ballot under section 1210(a.4)(1)," 25 P.S. § 3150.16(b)(2), the dissent views the concept of casting a ballot "under" that paragraph as distinct from

_____

[8] There is no suggestion in the record, nor did the trial court find as a fact, that the election workers told Wagner not to sign the envelope. Wagner testified he was told he did not have to date some unspecified document, *see* N.T., May 9, 2024, at 22, but he never claimed he was told not to sign the outer envelope. As noted above, at the trial court hearing Wagner thought he "probably" did sign that envelope. *Id.* at 24.

The issue before us might be different if the record reflected that the government or its agents affirmatively dissuaded Wagner from signing the envelope. We leave for another day whether that difference would materially change our analysis.

casting a ballot "in accordance with subsection [1210](a.4)," 25 P.S. § 3050(a.2), noting further that the General Assembly "pinpointed" paragraph (1) of subsection (a.4). Concurring and Dissenting Op. at 9. The dissent thus asserts that only paragraph (a.4)(1) applies in that type of situation, and so paragraphs (a.4)(2)-(12) have no application. *See id.* at 9-10 (indicating "the other provisions that fall under Section 3050(a.4)" including the signature and signature-comparison requirements of (a.4)(3) and (5), "simply do not apply" to voters in Wagner's circumstances).

Paragraph (a.4)(1) states, in its entirety:

> At all elections an individual who claims to be properly registered and eligible to vote at the election district but whose name does not appear on the district register and whose registration cannot be determined by the inspectors of election or the county election board shall be permitted to cast a provisional ballot. Individuals who appear to vote shall be required to produce proof of identification pursuant to subsection (a) and if unable to do so shall be permitted to cast a provisional ballot. An individual presenting a judicial order to vote shall be permitted to cast a provisional ballot.

25 P.S. § 3050(a.4)(1).[9] As can be seen, paragraph (a.4)(1) allows a voter to "cast a provisional ballot" but it includes no method for doing so. The remaining paragraphs are integrally intertwined with paragraph (1) as they spell out the mechanics by which the ballot referred to in paragraph (1) is to be cast and handled thereafter by the poll workers and the county election board.[10] Such paragraphs are thus essential to the operation of the scheme by which *any* provisional ballot may be cast.

---

[9] The above references proof of identification pursuant to subsection (a), which provides, in full: "(a) At every primary and election each elector who appears to vote and who desires to vote shall first present to an election officer proof of identification. The election officer shall examine the proof of identification presented by the elector and sign an affidavit stating that this has been done." *Id.* § 3050(a).

[10] *See, e.g.*, *id.* § 3050(a.4)(3) (requiring all provisional ballots to remain in their sealed envelopes for return to the county election board); *id.* § 3050(a.4)(4) (requiring the election board to examine provisional ballot envelopes within seven days after the election and giving the means for challenges); *id.* § 3050(a.4)(8) (requiring the judge of (continued…)

In contrast, under the dissent's interpretation, because only paragraph (a.4)(1) would pertain there would be no statutory methodology at all. There would be no requirement that the voter place the ballot in a secrecy envelope or that the ballot be sealed in an outer envelope for return to the county election board, nor would the voter need to sign an affidavit attesting that this is the only ballot he is casting in the present election – as those mandates are stated in paragraphs (a.4)(2) and (3). The ballot could remain "naked" with no statutory instructions concerning how it is to be handled. Furthermore, there could remain nothing associated with the ballot to record the fact that a particular voter cast it, as ballots do not themselves have such identifying information. While the poll workers may have no record that the elector's mail-in ballot was already received, mail-in ballots need not arrive at the county election board until 8:00 p.m. on election night. This could open up an opportunity for double-voting.

In characterizing its reading as giving rise to an ambiguity, the dissent makes no mention of what procedure would be required by law, opting instead to focus on the concept that one of the difficulties the signature mandate alleviates is less compelling where the election workers are able to locate the person's name on the district register as someone who requested a mail-in ballot. But even assuming *arguendo* the need for a signature on the outer envelope is not as pronounced in that instance as in other scenarios, *see* Concurring and Dissenting Op. at 11-13 (referring to the "mischief to be remedied" in each circumstance), the dissent does not explain why all the other mechanical facets of paragraphs (a.4)(2)-(12) are unnecessary – and it would be arbitrary to view *some but not all* of the procedural requirements inherent in paragraphs (a.4)(2)-(12) as being presently applicable.

---

elections to certify the total number of provisional ballots cast and transmitted to the election board).

A more natural reading – and one that avoids a result that is "absurd, impossible of execution or unreasonable," 1 Pa.C.S. § 1922(1) – is that the General Assembly intended that any provisional ballot cast "under" (a.4)(1) necessarily implicates the procedures given in the succeeding paragraphs for *how* that ballot is to be cast and treated thereafter.

Finally, we are not persuaded constitutional principles require us to ignore such statutory requirements. Although the Board references this Court's pronouncement that voting regulations may not "deny the franchise itself, or make it so difficult as to amount to a denial," *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914), the Board does not indicate how a statute that requires an elector voting by provisional ballot to sign the ballot's outer envelope denies the franchise or makes it so difficult as to amount to a denial.

### III. The O'Donnell ballot

Turning now to the O'Donnell ballot, Walsh contends the Commonwealth Court erred in allowing that ballot to be canvassed given that O'Donnell's voter registration had been transferred to Schuylkill County. He argues O'Donnell always intended to return to his home that was undergoing renovations, which was therefore O'Donnell's legal domicile well before he physically moved back there. Cabell responds that the panel's interpretation of Section 701 was sound and accorded with its plain terms, which state:

> Every citizen of this Commonwealth eighteen years of age, possessing the following qualifications, **shall be entitled to vote at all elections**, provided he or she has complied with the provisions of the acts requiring and regulating the registration of electors:
>
> (1) He or she shall have been a citizen of the United States at least one month.
>
> (2) He or she shall have resided in the State ninety days immediately preceding the election.

(3) He or she shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, **he or she may**, if a resident of Pennsylvania, **vote in the election district from which he or she removed his or her residence within thirty days preceding the election**.

25 P.S. § 2811 (emphasis added). Cabell notes the trial court found O'Donnell physically moved out of his mother's house and into his newly-renovated house on March 29, 2024, which was within 30 days preceding the election, and he argues we should not disturb that finding as it is supported by O'Donnell's testimony.

A person's legal residence is not simply "wherever he *says* it is or where he says he *intends* it to be." *In re Stabile*, 36 A.2d 451, 452 (Pa. 1944) (emphasis in original). It is a question of fact to be determined based on the evidence of record. *See id.* While a person may have several residences, *see Melmark, Inc. v. Schutt*, 206 A.3d 1096, 1102 n.4 (Pa. 2019), "only one of those residences may qualify as that person's residence or domicile for purposes of the Election Code." *In re Nomination Petition of Driscoll*, 847 A.2d 44, 49-50 (Pa. 2004). Under Section 704 of the Election Code, when determining a voter's residence, the following rules, where applicable, are to be followed:

> (a) That place shall be considered the residence of a person in which his habitation is fixed, and to which, whenever he is absent, he has the intention of returning.
>
> (b) A person shall not be considered to have lost his residence who leaves his home and goes into another state or another election district of this State for temporary purposes only, with the intention of returning.
>
> (c) A person shall not be considered to have gained a residence in any election district of this State into which he comes for temporary purposes only, without the intention of making such election district his permanent place of abode.
>
> (d) The place where the family of a married man or woman resides shall be considered and held to be his or her place of residence, except where the husband and wife have actually separated and live apart, in which

case the place where he or she has resided for two months or more shall be considered and held to be his or her place of residence.

(e) If a person removes to another state with the intention of making such state his permanent residence, he shall be considered to have lost his residence in this State.

(f) If a person removes to another state with the intention of remaining there an indefinite time and making such state his place of residence, he shall be considered to have lost his residence in this State, notwithstanding he may entertain an intention to return at some indefinite future period.

(g) If a person removes to the District of Columbia or other Federal territory or foreign country to engage in the government service, he shall not be considered to have lost his residence in this State during the period of such service, and the place where the person resided at the time of his removal shall be considered and held to be his place of residence.

(h) If a person goes into another state and while there exercises the right of a citizen by voting, he shall be considered to have lost his residence in this State.

25 Pa.C.S. § 2814; *see also* 25 Pa.C.S. § 1302(b) (reflecting a similar list of rules for determining residence).

A review of these rules demonstrates that intent does play a crucial role in the establishment of residency under the Election Code. For example, under the first rule a person's move to another election district does not divest that person of residency in the original district where that person intends the move to be temporary and intends to return. A similar focus on intent is evident from rules (c), (e), and (f). *Accord Driscoll*, 847 A.2d at 50 (explaining a person cannot simply declare a new residence by purchasing a home; that person must intend to live there permanently); *see also In re Lesker*, 105 A.2d 376, 380 (Pa. 1954) (distinguishing a "tarrying place for some specific purpose of business or pleasure" from a "fixed, permanent, final home to which one always intends to return"). Because of this, Walsh emphasizes O'Donnell always intended to live permanently in the

McAdoo home he purchased in June 2023. Walsh posits such intent is only confirmed by O'Donnell's act of changing his vehicle registration to that address in December 2023, well over 30 days before the election. *See* Brief for Appellant a 22-23.

While these arguments are forceful as to the intent element, they omit consideration of the date O'Donnell moved to McAdoo. The trial court found as a fact that O'Donnell physically moved to his new house on March 29, 2024. As that finding was based on O'Donnell's testimony, which the trial court expressly credited, *see In re: Canvass of Provisional Ballots in 2024 Primary Election*, *slip op.* at 5 (C.P. Luzerne May 22, 2024) (unnumbered), *reprinted in* Brief for Walsh at Exhibit B, we will not disturb it.[11] This factor is relevant because the Election Code's rules pertaining to residence (listed above) reflect that a person's intent to stay in a place must be combined with a physical move to that place in order for a new residence to be established. There is no suggestion that establishment of a new place of residence can be accomplished through intent only prior to the actual relocation. *Accord In re Prendergast*, 673 A.2d 324, 327-28 (Pa. 1996) ("A new domicile can be acquired only by physical presence at a new residence plus intent to make that new residence the principal home."); *In re Hanssens*, 821 A.2d 1247, 1251-52 (Pa. Cmwlth. 1998) (same). We therefore agree with the Commonwealth Court and the trial court that O'Donnell's residence for Election Code purposes remained in Butler Township until March 29, 2024.

---

[11] Appellate courts review deferentially the facts as found by the trier of fact, who hears witness testimony first-hand and is thus better positioned to evaluate the credibility of the evidence. *See Commonwealth v. Johnson*, 231 A.3d 807, 818 (Pa. 2020). Here, the finding is adequately supported by the record. O'Donnell's testimony reflects that when he purchased the house it was "basically unlivable," and thus, a great deal of work had to be done before he could move in. N.T., May 9, 2024, at 31-32. While O'Donnell may have spent a few sporadic nights at the house, this was only to oversee the work that was taking place, and he did not move most of his belongings there, and move in with the intent of staying, until March 29, 2024. *See id.* at 32-33.

Still, the Board argues that on election day O'Donnell could have voted in his new election district in Schuylkill County based on PennDOT having transferred his voter registration to that location in response to the change to his vehicle registration. *See* Brief for Appellee (Board) at 19-22. The Board references provisions of the National Voter Registration Act (NVRA),[12] and the Pennsylvania Voter Registration Act (PVRA),[13] under which motor-vehicle driver's license applications trigger voter registrations or registration changes. *See id.* at 20-21 (citing 25 Pa.C.S. § 1323; 52 U.S.C. §§ 20502, 20504). Conceding that the definition of a driver's license for NVRA purposes is limited to a state-issued "*personal* identification document," 52 U.S.C. § 20502(3) (emphasis added), the Board nonetheless insists such definition encompasses a *vehicle* registration. The Board adds that, once O'Donnell's registration was thus transferred in compliance with NVRA and PVRA, he lost his legal authorization to vote in Butler Township. *See* 25 Pa.C.S. § 1301.

The Board's argument is not well taken. In the first place, there is little reason to believe Congress intended the term "personal identification document" to subsume vehicle registration documents – and the Board cites no authority for that tenuous reading. For its part, in passing PVRA the General Assembly clearly had a different understanding,[14] as PVRA only authorizes PennDOT to provide a simultaneous application for voter registration, including an application to update an existing voter registration, in conjunction with the process for obtaining a driver's license per 75 Pa.C.S.

---

[12] Pub. L. No. 103-31, 107 Stat. 77, May 20, 1993 (codified as amended at 52 U.S.C. §§ 20501-20511).

[13] Act of Jan. 31, 2002, P.L. 18, No. 3 (codified as amended at 25 Pa.C.S. §§ 1301-1329).

[14] PVRA was intended to adopt NVRA's voter registration requirements so as to allow Pennsylvania to maintain a single voter registry for federal, state, and local elections. *See In re Vodvarka*, 140 A.3d 639, 648 (Pa. 2016), *superseded by statute on other grounds, as recognized by In re Major*, 248 A.3d 445, 447-48 (Pa. 2021).

§ 1510.[15] Any administrative decision by PennDOT or the Pennsylvania Department of State to transfer an elector's voter registration without that person's affirmative consent in conjunction with a PennDOT application to change a vehicle registration, as opposed to a driver's license, is therefore of questionable validity, particularly where, as here, no party has identified a valid administrative regulation authorizing such action.

Even if we were to accept *arguendo* that O'Donnell's voter registration was validly changed in combination with the change to his vehicle registration, he could not have lawfully voted in the new district because he did not reside there until March 29, 2024. *See* PA. CONST. art. VII, § 1(3) (setting forth as a qualification to vote that a person must have "resided in the election district . . . at least sixty (60) days immediately preceding the election").[16] Moreover, his entitlement to vote in Butler Township was guaranteed by Section 701(3) of the Election Code, *see* 25 P.S. § 2811(3), so long as his change of residence occurred within 30 days prior to the election – unless there is some reason to believe Section 701(3) did not apply under the present circumstances. Along these lines, the Board highlights that Section 1301(c) of PVRA, *see* 25 Pa.C.S. § 1301(c), reflects a general rule that a residence change results in an elector losing his right to vote in his old district. If set forth without exception, that rule might conflict with Section 701(3) of the Election Code. But it is not without exception: it is stated to be "except as provided by law," which necessarily includes Section 701.[17] While certainly O'Donnell could not

---

[15] *See* 25 Pa.C.S. § 1323(a); *see also id.* § 1321 (reflecting four ways an individual may register to vote, including by applying for a driver's license, but not including applying for a vehicle registration or a registration change).

[16] We offer no opinion concerning the difference between the statutory 30 days and the 60 days reflected in the Constitution, as no such issue has been raised in this case.

[17] To be precise, Section 1301(c) is made applicable "except pursuant to the provisions of this section," one of which is subsection 1301(b). That subsection, in turn, states that "[n]o individual shall be permitted to vote at any election unless the individual is registered under this subsection, *except as provided by law*[.]" 25 Pa.C.S. § 1301(b) (emphasis (continued…)

lawfully vote in two places in the same election, where, as here, his residence changed "within thirty days preceding the election," he was "entitled to vote" in his old district. 25 P.S. § 2811(3); *see also* PA. CONST. art. VII, § 1 (directing that every qualified elector "may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within sixty (60) days preceding the election").

Finally, the Board contends this result will lead to confusion among county election officials. *See* Brief for Appellee (Board) at 22. The legislatively designed provisional-ballot mechanism seeks to alleviate some of this confusion by allowing a vote to be cast and any issues raised with respect to that vote to be cleared up within a reasonable interval after the election. In handling provisional ballots in the post-election timeframe, county election boards are directed to consult the governing law as clarified by the analysis contained in judicial decisions such as this one. In all events our obligation in resolving the present appeal is to faithfully interpret and apply that law. Any lingering confusion is a matter to be remedied by the General Assembly and/or the appropriate administrative agencies to the extent of their authorization.

## IV. Conclusion

For the reasons given above, the order of the Commonwealth is affirmed.

Chief Justice Todd and Justices Dougherty, Wecht and Brobson join the opinion.

Justice Wecht files a concurring opinion in which Justice Brobson joins.

Justice Donohue files a concurring and dissenting opinion in which Justice McCaffery joins.

---

added). To the extent there is any doubt about how these statutory provisions interact, as explained above it must be resolved to protect the franchise.