**[J-59-2024] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| IN RE: CANVASS OF PROVISIONAL BALLOTS IN THE 2024 PRIMARY ELECTION | : | No. 55 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at 628 CD |
| | : | 2024 dated July 1, 2024 Reversing |
| APPEAL OF: JAMIE WALSH | : | the Order of the Luzerne County |
| | : | Court of Common Pleas, Civil |
| | : | Division, at 2024-05082 dated May |
| | : | 15, 2024. |
| | : | |
| | : | SUBMITTED: August 7, 2024 |

**CONCURRING OPINION**

**JUSTICE WECHT**                    **DECIDED: September 13, 2024**

Yet again, we are called upon to decide whether the Election Code really means what it says. Like the Majority, I believe that it does, and that the two issues presented in this appeal are resolved by the plain statutory language and the facts established in the trial court. I join the Majority Opinion in full.

In the first issue on appeal, the appellant, Jamie Walsh, argues that the Luzerne County Board of Elections should be required to count the provisional ballot cast by Timothy Wagner, even though Wagner did not sign the outer envelope as the Election Code requires.[1] Rather than examining what the statute requires, Walsh would have us disregard the statute based upon Wagner's clear electoral intent, the instructions of

---

[1]     25 P.S. § 3050(a.4)(3) ("After the provisional ballot has been cast, the individual shall place it in a secrecy envelope. The individual shall place the secrecy envelope in the provisional ballot envelope and shall place his signature on the front of the provisional ballot envelope. All provisional ballots shall remain sealed in their provisional ballot envelopes for return to the county board of elections.").

election workers, and the absence of any allegation of fraud. The Majority correctly rejects this argument. Not only does the Election Code unambiguously require the signature—the voter "shall" place his or her signature on the front of the envelope[2]—the Code unambiguously imposes a consequence for failing to do so. The ballot "shall not be counted."[3]

This appeal is the latest in a line of cases in which the courts are asked to disregard unambiguous statutory requirements for voting because those requirements are purportedly not a "necessity," because they are directives rather than mandates, or because they are mere "technicalities." Although the proffered reasons change, the idea is the same: this Court should disregard plain statutory requirements in favor of counting non-compliant votes. Although the Court has been amenable to such arguments in the past, I continue my efforts to turn this unfortunate tide. We must apply clear statutory mandates.

Seventy years ago, for example, construing a provision of the Election Code that authorized a voter to write-in the name of a candidate whose name was not already printed on the ballot,[4] this Court focused not upon the statutory language but upon the principle that election laws are to be construed in favor of the right to vote, and that "[t]echnicalities should not be used to make the right of the voter insecure."[5] In *Appeal of Weiskerger*,[6] we held that the Election Code did not require the disqualification of ballots that were not completed in the color of ink that the Election Code required, because the

---

[2]     25 P.S. § 3050(a.4)(3).

[3]     25 P.S. § 3050(a.4)(5)(ii) (providing that a provisional ballot without the signature required by 20 P.S. § 3050(a.4)(3) "shall not be counted").

[4]     25 P.S. § 2963(e).

[5]     *Appeal of James*, 105 A.2d 64, 65-66 (Pa. 1954).

[6]     290 A.2d 108, 109 (Pa. 1972).

statute's mandatory language was only directory, and because "minor irregularities" should only sparingly be used to disqualify a ballot.[7]

Because the Court decided *James* and *Weiskerger* before the 1972 enactment of the Statutory Construction Act ("SCA"), which requires courts to consider legislative intent only when the statutory language is ambiguous,[8] their continued viability is questionable.[9] In *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election* ("*Absentee & Mail-In 2020*"),[10] however, the Opinion Announcing the Judgment of the Court ("OAJC") reanimated the ideas that we should continue to construe clear statutory law regulating voting "to insure rather than defeat the exercise of the right of suffrage," that "technicalities should not be used to make the right of the voter insecure," and that requirements that the Court believed to be "unnecessary" may be overlooked.[11] Because the statutory requirement was plainly made "in unambiguously mandatory terms," I indicated my intent to treat the requirements of the Election Code as mandatory in future elections.[12]

---

[7]     *Id.* at 109 (quoting *Reading Election Recount Case,* 188 A.2d 254, 256 (1963)).

[8]     *See* 1 Pa.C.S. § 1921(b).

[9]     *Appeal of Pierce*, 843 A.2d 1223, 1231 (Pa. 2004).

[10]     241 A.3d 1058 (Pa. 2020) (plurality).

[11]     *Id.* at 1062 (quoting *James*, 105 A.2d at 66)

[12]     *Id.* at 1079 (Wecht, J., concurring and dissenting). The statutory requirements at issue were contained in 25 P.S. §§ 3146(a) and 3250.16(a), which provided that absentee and mail-in voters "shall" date the outer envelope of the ballot. Although I found the statutory requirement to be unambiguous, I also recognized the circumstances under which the issue arose, including confusing and contradictory guidance issued by the Secretary of State and the lack of information available to voters regarding the consequence of failing strictly to adhere to the requirements. *Id.* at 1089. These circumstances led me to apply my interpretation prospectively. *Id.* at 1080.

I am perplexed by the continued profusion and proliferation of briefing from litigants and *amici curiae* alike advocating for the acceptance of ballots that do not comply with the plain terms of the Election Code. I urge litigants and their *amici* to redirect their pleading from the judiciary to the political actors who have a role in establishing the statutory voting requirements. It is the legislature that drafts, and the Governor that approves, the legal prerequisites to having a ballot counted. Challenges to the counting of ballots or to the disregard of ballots inherently arise in a politics-laden area of the law. Arguments about voting requirements and efforts to liberalize provisions of the Election Code should be directed to these political branches.

The judiciary does not make policy judgments about the franchise outside of constitutional requirements[13] or the common law. "[T]he judiciary should act with restraint, in the election arena, subordinate to express statutory directives. Subject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania."[14] Indeed, it is befuddling and frustrating that advocacy to disregard the plain text of legislation continues in the judiciary, particularly given the amenability of the political branches to such lobbying. To the extent that Walsh believes that Wagner's electoral intent was clear, that Wagner followed the instructions of a poll worker, that there was no evidence of fraud, and that these circumstances militate in favor of disregarding the signature requirement of Section 1210(a.4)(3),[15] these arguments should be directed to the General Assembly, not the courts.

---

[13] *See, e.g.*, PA. CONST. art. 1, § V ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.").

[14] *In re Guzzardi*, 99 A.3d 381, 386 (Pa. 2014).

[15] 25 P.S. § 3050(a.4)(3).

While we interpret ambiguous terms in favor of ensuring enfranchisement in the absence of fraud and in the presence of clear voter intent, our liberal construction does not give us license to disregard the plain language of the Election Code.[16] As we recently explained, "while it is established public policy in this Commonwealth to protect the elective franchise, a liberal construction of Code provisions comes into play only where an election statute is ambiguous."[17] Indeed, there is no need to liberally construe anything in the face of plain language.

Here, the General Assembly imposed a clear requirement for Wagner to sign the privacy envelope of his provisional ballot,[18] and there is a clear consequence for his failure to do so: it "shall not be counted."[19] It does not matter what Wagner's intent was, what result equity would favor,[20] whether fraud was absent, or whether Walsh viewed this

---

[16] *Appeal of Pierce*, 843 A.2d at 1231 ("All things being equal, the law will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the Election Code."); *Trust under Agreement of Taylor*, 164 A.3d 1147, 1155 (Pa. 2017) ("If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent and not look beyond the statutory language to ascertain its meaning.").

[17] *In re Major*, 248 A.3d 445, 450 (Pa. 2021) (internal quotations omitted); *see also id.* ("Only where there are at least two reasonable interpretations of the text do we then turn to interpretive principles that govern ambiguous statutes generally, and election matters specifically, including the principle that the Election Code must be liberally construed so as not to deprive an individual of his right to run for office, or the voters of their right to elect a candidate of their choice.") (internal quotations omitted); *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 360-61 (Pa. 2020) ("*PDP*")(applying the interpretive principle that the Election Code is to be liberally construed after determining that the statute is ambiguous); *Petition of Cianfrani*, 359 A.2d 383, 384 (Pa. 1976) ("the policy of the liberal reading of the Election Code cannot be distorted to emasculate those requirements necessary to assure the probity of the process.").

[18] 25 P.S. § 3050(a.4)(3).

[19] *Id.* § 3050(a.4)(5).

[20] *See Guzzardi*, 99 A.3d at 382 (holding that Pennsylvania courts may not resort to principles of equity to override "the express statutory command that the failure of a candidate for statewide public office to file a timely statement of financial interests . . . (continued…)

requirement as a "technicality" that the courts are somehow free to disregard. Neither equitable nor extratextual considerations have any place in the application of the Election Code's plain language.[21] This is true even if the General Assembly's requirement "appears to have a disenfranchising effect," or even if jurists think such a requirement is foolish or ridiculous or benighted, so long as the statute is constitutional.[22] Our only task in applying unambiguous legislative enactments is to recognize that the legislature meant what it said.

In making his argument, Walsh asserts that the requirement for Wagner to place an additional signature on the front of the outer envelope was unnecessary. In *Absentee & Mail-In 2020*, the OAJC engaged in a similar analysis, holding that the requirement of a handwritten date was rendered "unnecessary" as a result of the date-stamping of ballots by county boards of elections.[23] Both of these analyses miss the mark. It is not a question of what a particular judge or justice or court may believe to be necessary. Indeed, if our opinions about what should be necessary were at all relevant to our interpretation of the Election Code, our work would never end. The legislature, with the Governor's approval, decides what is or is not necessary.[24] When those branches enacted the Election Code, with all of its mandates, the policy choices about what is or is not necessary were baked

---

shall . . . be a fatal defect to a petition to appear on the ballot") (quoting 65 Pa.C.S. § 1104(b)(3)).

[21] *Id.* at 387 (holding that, "where the Legislature has attached specific consequences to particular actions or omissions, Pennsylvania courts may not mitigate the legislatively prescribed outcome through recourse to equity").

[22] *Canvass of Absentee & Mail-In 2020*, 241 A.3d at 1082 (Wecht, J., concurring and dissenting).

[23] *Id.* at 1077.

[24] *Guzzardi*, 99 A.3d at 386 (recognizing that the General Assembly is the arbiter of what is "necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania").

into the terms of the statute. The question for a court is not what is "necessary." The question is what the statute means. And if the language is plain, the answer is clear.

Walsh attempts to overcome the plain language of Section 1210 of the Election Code by challenging the mandatory nature of the word "shall" contained therein.[25] Walsh again relies upon the OAJC in *Absentee & Mail-In 2020* as holding that the Election Code's use of the word "shall" is directory, rather than mandatory, when the statutory requirement can be considered "unnecessary."[26] Walsh believes that Wagner's signature was "unnecessary and superfluous,"[27] rendering the statutory use of "shall" in 25 P.S. § 3050(a.4)(5)(ii) directory, not mandatory, and Wagner's failure to comply to be inconsequential.

In construing the requirement that a voter casting a provisional ballot "shall place his signature on the front of the provisional ballot envelope,"[28] the Majority recognizes that this Court has sometimes interpreted the word "shall" as directory rather than mandatory, and has refused to disqualify ballots that did not conform to the statute.[29] Whether "shall" is directory—"you should"—or mandatory—"you must"—is a question that Pennsylvania courts have "labored mightily but in vain" to answer.[30]

---

[25] 25 P.S. § 3050(a.4)(3) (providing that the individual voting by provisional ballot "shall place his signature on the front of the provisional ballot envelope"); *see also id.* at § 3050(a.4)(5) (providing that a provisional ballot without such a signature "shall not be counted").

[26] Appellant's Br. at 9.

[27] *Id.* at 19.

[28] 25 P.S. § 3050(a.4)(3).

[29] Maj. Op. at 7.

[30] *PDP*, 238 A.3d at 391 (Wecht, J., concurring and dissenting).

Although in *James* the Court disregarded a mandatory requirement indicated by use of the word "shall,"[31] we held shortly thereafter that "shall" as used in Section 909 of the Election Code[32] was "mandatory."[33] "To hold otherwise would be to thwart the evident intent and purpose of the provision and to introduce confusion, if nothing worse, in connection with the filing of nomination petitions."[34] And although *Weiskerger*[35] held that a requirement of the Election Code was directory because the Code did not specify that noncompliance would void the ballot, *Pierce* called this analysis into question given the subsequent enactment of the SCA.[36] Applying the SCA to our interpretation of the Election Code in *Pierce*, we observed that, "all things being equal, the law will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the Election Code."[37] Acknowledging that "some contexts may leave the precise meaning of the word 'shall' in doubt,"[38] the *Pierce* Court recognized "the

---

[31]     *James*, 105 A.2d at 66.

[32]     25 P.S. § 2869.

[33]     *In re Steel*, 105 A.2d 139, 141 (Pa. 1954).

[34]     *Steel*, 105 A.2d at 141.

[35]     290 A.2d at 109.

[36]     *Pierce*, 843 A.2d at 1231 ("*Wieskerger Appeal*, of course, was decided before the enactment of the Statutory Construction Act, which dictates that legislative intent is to be considered only when a statute is ambiguous."); *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 n. 2 (Pa. 1997) (reliance on case for proposition that "shall" may be merely directory depending upon legislature's intent misplaced because case was decided before enactment of Statutory Construction Act).

[37]     *Pierce*, 843 A.2d at 1231.

[38]     *Id.* (citing B. Garner, DICTIONARY OF MODERN LEGAL USAGE 939 (2d. ed. 1995) ("Courts in virtually every English speaking jurisdiction have held—by necessity—that shall means may in some contexts, and vice versa")).

unambiguous meaning of the word in most contexts" as carrying "an imperative or mandatory meaning."[39]

Notwithstanding the *Pierce* Court's attempt to rein in the slippery language of *Weiskerger*, the Court reverted to type just days later in *Shambach v. Bickhart*,[40] holding that the Election Code's requirement that a write-in vote could only be made for a candidate not already on the ballot was directory, rather than mandatory, because the Code did not require non-compliant write-in votes to be excluded. The *Shambach* Court relied upon precedent pre-dating the SCA, as well as the absence of a legislative consequence for noncompliance.[41]

Later, in *In re Scroggin*, the Court returned to applying the language of the Election Code according to its terms, holding that the failure to comply with the affidavit requirement of 25 P.S. § 2911(e) was a fatal defect.[42] In this context, we held that "the policy of the liberal reading of the Election Code cannot be distorted to emasculate" the mandatory affidavit requirement, which the General Assembly had deemed "necessary to assure the probity of the process."[43]

In *PDP*, we applied the Election Code's mandatory requirement that mail-in ballots be sealed in secrecy envelopes and rejected the argument that "shall" should be interpreted as directory. Accepting such an argument would render the Election Code's

---

[39]     *Id.*; *see also Oberneder*, 696 A.2d at 150 ("By definition, 'shall' is mandatory.").

[40]     845 A.2d 793, 801-02 (Pa. 2004).

[41]     *Id.* at 801 (rejecting the argument that the Election Code requires write-in votes cast for listed candidates to be excluded; stating the Code "does not declare that such a write-in vote must be voided and may not be counted").

[42]     237 A.3d 1006, 1019 (Pa. 2020).

[43]     *Id.* (quoting *Cianfrani*, 359 A.2d at 384)

clear language "meaningless and, ultimately, absurd."[44]  Our analysis in *PDP*, as in *Pierce*, was clear: "shall means *shall*."[45]  Although I joined the Majority in *PDP*, I wrote separately in support of the Court's ruling that a violation of the statutory requirement that mail-in ballots be returned in their secrecy envelopes resulted in the invalidation of those ballots.

In *Absentee & Mail-In 2020*, a plurality of the Court held that absentee and mail-in ballots should be counted even though the declaration on the outer envelope lacked a date, which the Election Code required the voter to supply.[46]  In reaching this conclusion, the OAJC construed the word "shall" as directory ("*i.e.*, a directive from the Legislature that should be followed but the failure to provide the information does not result in invalidation of the ballot"[47]) rather than mandatory, because, in the plurality's view, the Election Code's date requirements did not serve any "weighty interests."[48]  Because the Election Code's date requirement was clear and unambiguous, I did not agree.  Rather, in my view, "the only practical and principled alternative" to having courts second-guess whether the legislature meant a requirement to be mandatory, "is to read 'shall' as mandatory."[49]

Concurring in both *PDP* and *Absentee & Mail-In 2020*, I have tracked my "increasing discomfort with this Court's willingness to peer behind the curtain of

---

[44]    238 A.3d at 379.

[45]    *Absentee & Mail-in 2020*, 241 A.3d at 1084 (Wecht, J., concurring and dissenting) (emphasis in original) (citing *PDP*, 238 A.3d at 380, *Pierce*, 843 A.2d at 1232).

[46]    *Id.* at 1062.

[47]    *Id.*

[48]    *Id.* at 1076-77 (quoting *PDP*, 238 A.2d at 379-80).

[49]    *Id.* at 1087 (Wecht, J., concurring and dissenting).

mandatory statutory language in search of some unspoken directory intent."[50] After all of these cases, we should not be haggling over whether a statutory requirement indicated by the verb "shall" is directory or mandatory. The General Assembly relies upon the judiciary to apply the language that it writes into statutes. It knows the difference between a suggestion and a mandate and how to differentiate between the two. The onus is upon the legislature to make policy judgments about what is necessary to ensure the integrity of our elections, and it is the duty of the judiciary to construe these mandates as the plain language directs. Only by reading "shall" as mandatory do we respect the legislative prerogative for making policy judgments about the conduct of elections.

Any arguments about the meaning of "shall" in 25 P.S. § 3050(a.4)(3) are particularly unpersuasive in this case because the General Assembly has attached a particular consequence for failing to adhere to the mandate to sign the privacy envelope of a provisional ballot.[51] Having established a clear consequence for the failure to follow the mandatory signature requirement, the General Assembly avoids any textual confusion that may arise in light of our sometimes befuddling precedent construing the term "shall."

In advancing his argument, Walsh minimizes Wagner's failure to abide by the signature requirement as "a mere technical error."[52] Encouraged by the OAJC in *Absentee & Mail-In 2020*, Walsh suggests that if a requirement of the Election Code can be considered a technicality, then noncompliance with that requirement may be excused.

We are faced with the repeated invocation through litigation and jurisprudence that ballots are being disregarded because of "mere technicalities," as if the statutory requirements to have votes counted are meaningless drivel. The dissent in the

---

[50] *Id.* at 1080 (Wecht, J., concurring and dissenting).

[51] 25 P.S. § 3050(a.4)(5)(ii)(A).

[52] Appellant's Br. at 19.

Commonwealth Court, for example, disregarded the statutory language by characterizing Wagner's failure to sign his ballot as a "mere technicality."[53]  The plurality in *Absentee & Mail-In 2020* similarly portrayed statutory requirements as "technicalities" that "should not be used to make the right of the voter insecure."[54] In a similar vein, the plurality also purported to discern whether a statutory mandate was truly directory by distinguishing between "weighty interests" and "minor irregularities," as if the Court has the discretion to disregard plain statutory language in service of the latter but not the former.[55]

By this measure, statutory interpretation, the development of the common law, and upholding the Constitution are all endeavors that are equally subject to the same attack. Courts live in a world of technicalities.  Technicality is our bailiwick, our bread and butter. It is the reason that litigants seek the clarity that we provide.  Everything we do is enmeshed with technicalities.  Indeed, a large part of the stock and trade of the legal profession is to advise, counsel, and litigate technicalities.  I have no patience for the repeated invocation of technicalities as a way to disparage this Court's role in applying the law as written.  Technicalities play too big a role in all aspects of the law to be dismissed as meaningless.  Indeed, "[i]t is well-settled that the 'so-called technicalities of the Election Code' must be strictly enforced, 'particularly where . . . they are designed to reduce fraud.'"[56]  The parties and the courts seem to characterize a statutory requirement

---

[53]     *In re Canvass of Provisional Ballots in 2024 Primary Election*, 628 C.D. 2024, 2024 WL 3252970, at *7 (Pa. Cmwlth. 2024) (Wolf, J., dissenting) (unreported).

[54]     241 A.3d at 1062.

[55]     *Id.* at 1073.

[56]     *Scroggin*, 237 A.3d at 1018 (citing *Pierce*, 843 A.2d at 1234).

as a technicality, a "minor irregularity,"[57] or superfluous,[58] when they seek to overcome clear statutory requirements.

Within the bounds of constitutional protections, the legislature is free to impose technicalities, and the courts are bound to apply them. Although the Election Code will be interpreted "with unstinting fidelity to its terms,"[59] considerations under the Constitution's Free and Equal Election Clause may moderate its enforcement in particular cases.[60] Arguments advanced under federal statutes, such as the Voting Rights Act,[61] may also require additional considerations and analyses. Neither the Pennsylvania Constitution nor federal law is implicated in this case.

With respect to the second issue on appeal—the O'Donnell ballot—Walsh argues that, because O'Donnell had transferred his voter registration to his new address in Schuylkill County, his provisional ballot in Luzerne County cannot be counted. The Majority rightly rejects this argument based upon the fact, found by the trial court, that O'Donnell did not move from Luzerne County until March 29, 2024.[62] In an attempt to overcome this factual finding, the Luzerne County Board of Elections argues that O'Donnell was able to vote in Schuylkill County because the Department of

---

[57] *See Absentee and Mail-In 2020*, 214 A.3d at 1082 (Wecht, J., concurring and dissenting) (observing that this Court has yet to define "minor irregularity" with anything approaching suitable rigor).

[58] *Id.* at 1077 ("The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfluous.").

[59] *Id.* at 1089 (Wecht, J., concurring).

[60] PA. CONST. art. I, § 5.

[61] 52 U.S.C. § 10301.

[62] Maj. Op. at 13.

Transportation ("PennDOT") transferred his voter registration to the new address when O'Donnell renewed his vehicle registration.

The fact that PennDOT transferred a voter's registration to a new address based upon the renewal of a vehicle registration strikes me as peculiar and worthy of comment. Walsh asserts that O'Donnell voluntarily changed his voter registration to his new home in December 2023,[63] and the trial court explained that O'Donnell "opted to change" his voter registration when he made the renewal.[64] The trial court cited testimony by an election official concerning a change in PennDOT's vehicle registration system in Summer 2023. That change requires persons registering vehicles to opt out of concurrent updates of their voter registration. Absent affirmative opt-out selections, the voter's address is now updated to that at which the vehicle is being registered.[65]

The Pennsylvania Voter Registration Act provides several methods of voter registration, none of which is tied to the application or renewal of a vehicle registration.[66] To the extent PennDOT has taken it upon itself to transform a vehicle registration renewal into a change in voter registration, it appears to have done so in the absence of any legislative directive.[67] Although PennDOT's rogue transfer of voter registration in this case ultimately did not deprive O'Donnell of the right to vote, it would be troubling if PennDOT has a practice of making such a transfer without statutory authorization, or even the voter's consent.

---

[63]    Appellant's Br. at 10.

[64]    Tr. Ct. Op. at 5.

[65]    *Id.* at 6.

[66]    25 P.S. § 1321.

[67]    *See* Maj. Op. at 15.

A final point. The Pennsylvania Constitution imposes several qualifications for the entitlement to vote. One such qualification is that the citizen:

> shall have resided in the election district where he or she shall offer to vote at least sixty (60) days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within sixty (60) days preceding the election.[68]

By contrast, the Election Code requires that the citizen:

> shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within thirty days preceding the election.[69]

The discrepancy between the sixty-day requirement of the Constitution and the thirty-day requirement of the Election Code is curious, and would appear to create a potential pitfall for unwary voters. A citizen who changed residences forty-five days before an election, for example, would appear not to be permitted by the Constitution to vote in the election district of her new residence, but also is not permitted by the Election Code to vote in the election district of her old residence. As the Majority notes, however, the difference between the Constitution and the Election Code has no bearing on this case.[70]

I join the Majority fully in its rejection of the arguments advanced by Walsh on appeal and in its affirmance of the Commonwealth Court's order.

Justice Brobson joins this concurring opinion.

---

[68]    PA. CONST. art. 7, § 1(3).

[69]    25 P.S. § 2811.

[70]    Maj. Op. at 16 n.14.